(No. 49337.-

BIO-MEDICAL LABORATORIES, INC., Appellee, v. JAMES L. TRAINOR, Director of Public Aid, Appellant.

*Opinion filed October 17, 1977.*

542

DOOLEY, J., dissenting.

William J. Scott, Attorney General, of Springfield (William A. Wenzel, Special Assistant Attorney General, of Chicago, of counsel), for appellant.

Burke, Weber and Egan, of Chicago (Edward J. Egan,

of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Bio-Medical Laboratories, Inc., filed suit in the circuit court of Cook County seeking to restrain the defendant, James L. Trainor, Director of the Illinois Department of Public Aid, or his successor from suspending plaintiff's right to participate in the Illinois medical assistance program (Medicaid) (Ill. Rev. Stat. 1975, ch. 23, par. 5—1 *et seq.*). The trial court granted a "Temporary Restraining Order," and, after briefing and argument, denied defendant's motion to dismiss and entered a preliminary injunction, having found defendant to be without express or implied statutory authority to suspend or terminate plaintiff's participation. Because the issue of the defendant's authority has arisen in other cases presently pending before the circuit court, we ordered defendant's appeal taken directly to this court pursuant to Rule 302(b) (58 Ill. 2d R. 302(b)).

Plaintiff has participated in the Medicaid program since 1969. In 1976, after it was discovered that the Department of Public Aid's (Department) reimbursements to plaintiff had increased 58% over a three-month period, defendant ordered an audit of plaintiff's clinic billing and record-keeping procedures. On November 24, 1976, Robert G. Wessel, defendant's chief assistant, notified plaintiff that it would be terminated from further participation if it failed to submit certain business records to the Department within 15 days. Two days later, representatives of both parties met and allegedly reached an agreement regarding plaintiff's duty to disclose certain records. According to the defendant, plaintiff was thereafter notified that no further action would be taken pursuant to the Department's threat of suspension. On November 30, the Department's auditors filed their report

citing certain discrepancies in plaintiff's billing procedures which had resulted in alleged overpayments of $9,990.75. By extrapolation, the auditors determined that an estimated $321,291 in overpayments had been paid to plaintiff during an 18-month period. As a result of these alleged improper billing procedures and plaintiff's refusal to turn over records, the Department's auditors recommended to the defendant that plaintiff be suspended from further participation as a Medicaid vendor, and that action be taken to recoup the overpayments.

One week later, plaintiff filed its suit for injunctive relief alleging that defendant had indicated his intention to suspend plaintiff from the program forthwith. It also alleged that 90% of its business involved Medicaid payments, and asserted that defendant was without authority to suspend.

In an affidavit filed with the defendant's motion to dismiss, defendant stated that any action taken by the Department would be subject to the Department's rules and regulations, and that plaintiff would not be terminated until procedural requirements in accordance with those rules had been met.

Defendant has raised several threshold issues challenging plaintiff's legal authority to maintain this action. He asserts plaintiff lacks standing in that no formal notice of intent to terminate had been served pursuant to rule, and that no other formal action had been taken to implement the auditors' recommendation to suspend or recoup overpayments. Despite defendant's characterization of this issue as one involving standing, the real question is whether there is a controversy ripe for adjudication.

It is elementary that a motion to dismiss admits all facts well pleaded. We therefore must assume plaintiff's allegation that "defendant, James Trainor, has informed the plaintiff that he intends to forthwith suspend the plaintiff from the Public Aid Program" is a true statement.

The auditors' report recommended that plaintiff be suspended from the program, and all that remained for the defendant to decide was whether action would be taken on the basis of that report.

The basic rationale of the ripeness doctrine as it relates to challenges against unlawful administrative action "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." (*Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515.) Absent defendant's announced intention, we would agree that plaintiff's action was premature. Defendant's threat of action, however, along with the recommendation of the auditors, constituted a sufficient final determination to warrant judicial consideration.

Defendant also asserts that plaintiff lacks standing in that it has no protectable interest at stake. It is argued that no vendor, medical or otherwise, has a substantive legal right to do business with the State against the State's will, and that no medical vendor has "a right or interest either recognized by common law or created by statute" to continue participation in the Medicaid program. Defendant cites *Perkins v. Lukens Steel Co.* (1940), 310 U.S. 113, 84 L. Ed. 1108, 60 S. Ct. 869, for the proposition that no citizen has the "right" to do business with the government, and, therefore, has no standing to challenge the rules and regulations imposed as a condition of doing business. *Perkins,* however, is not applicable to this case. There, certain iron and steel manufacturers sought to restrain the Secretary of Labor from carrying out an administrative determination that all future government contracts require, as a contractual condition, that the supplier pay

its employees the minimum wage prevailing in a given locality. The Supreme Court held that, as prospective bidders, the steel and iron manufacturers did not have standing to challenge the Secretary's determination because (1) the government was entitled to impose contractual conditions on parties it had chosen to contract with, and (2) the steel and iron manufacturers were unable to show that a legal right had been invaded or threatened. Here, however, the plaintiff possesses a legal interest which is threatened, that being its expectation of continuing to receive Medicaid payments on behalf of the Medicaid recipients it services. Contrary to defendant's contention, this "expectation interest" has been recognized as a protectable legal interest. (See, e.g., *Hathaway v. Mathews* (7th Cir. 1976), 546 F.2d 227, 230; *Case v. Weinberger* (2d Cir. 1975), 523 F.2d 602, 606.) "Interruption of an existing relationship between the government and a contractor places the latter in a different posture from one initially seeking government contracts and can carry with it grave economic consequences." (*Gonzalez v. Freeman* (D.C. Cir. 1964), 334 F.2d 570, 574.) In *Gonzalez*, plaintiff sought to challenge the Secretary of Agriculture's authority to terminate its eligibility to participate in the Commodity Credit Corporation's contracting program. The court there stated:

> "Thus to say that there is no 'right' to government contracts does not resolve the question of justiciability. Of course there is no such *right*; but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts. An allegation of facts which reveal an absence of legal authority or basic fairness in the method of imposing debarment

presents a justiciable controversy in our view." (334 F.2d 570, 574-75.)

See also *Buettell v. Walker* (1974), 59 Ill. 2d 146, 151-52, wherein this court held a State contractor had standing to challenge the Governor's authority to require him to disclose political contributions as a condition of doing business with the State.

We hold, therefore, that plaintiff has standing to challenge the defendant's authority to suspend.

A challenge is also made on the grounds that plaintiff's action is barred by the doctrine of sovereign immunity. It is argued that, in essence, this action is one against the State, seeking to have it continue to do business with plaintiff. Plaintiff is not attempting to enforce a present claim against the State but, rather, seeks to enjoin the defendant from taking actions in excess of his delegated authority and in violation of plaintiff's protectable legal interests. Such a suit does not contravene the immunity prohibition. (*E.g., County of Cook v. Ogilvie* (1972), 50 Ill. 2d 379, 383; *Owens v. Green* (1948), 400 Ill. 380, 408-09; *People ex rel. Freeman v. Department of Public Welfare* (1938), 368 Ill. 505, 506-07.) For reasons the same as expressed above, we also reject defendant's contention that the Court of Claims has exclusive jurisdiction over the subject matter of this action.

A final threshold contention raised by the defendant is the appropriateness of injunctive relief. He argues that plaintiff should have first submitted itself to the hearing procedures established by the Department's rules and regulations, and then sought a review of the Director's authority by writ of *certiorari*. This argument must be rejected, for a party need not exhaust his administrative remedies where the statute, or in this instance, administrative rule, is attacked on its face. *Walker v. State Board of Elections* (1976), 65 Ill. 2d 543, 551-52; *Doe v. Jones* (1927), 327 Ill. 387, 392.

It is argued that plaintiff failed to show irreparable harm or the lack of an adequate remedy at law. It was alleged and not denied that 90% of plaintiff's business involved Medicaid payments. From this fact it could reasonably be inferred that wrongful suspension from the Medicaid program, for any length of time, would cause damages of an uncertain magnitude. Any subsequent action against the State by the plaintiff for damages resulting from an unlawful suspension would certainly raise issues of governmental immunity. For there to be an adequate remedy at law which will deprive equity of its power to grant injunctive relief, the remedy "must be clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy." (*K.F.K. Corp. v. American Continental Homes, Inc.* (1975), 31 Ill. App. 3d 1017, 1021.) Plaintiff's entitlement to damages is not only uncertain, but an action for damages in a case of this nature would not be "as practical and efficient to the ends of justice" as an action for injunctive relief. Consequently, we find that plaintiff's complaint did show a threat of irreparable harm and the lack of an adequate remedy at law.

The parties have raised many arguments concerning defendant's authority under the Illinois Public Aid Code (Code) (Ill. Rev. Stat. 1975, ch. 23, par. 1—1 *et seq.*). Given the posture of this case, however, the sole issue before this court is whether defendant has the delegated authority to suspend or terminate Medicaid vendors.

Defendant concedes that the Code does not expressly grant him the authority to either suspend or terminate vendors suspected of committing fraud or abuse. He argues, however, that such authority can and should be implied from both the express provisions of the Code and the requirements of certain Federal regulations.

He asserts Federal regulations require as a condition to the receipt of Federal money that all State agencies adopt

methods and procedures for identifying and eliminating Medicaid vendors guilty of fraud or abuse, and that, to the extent the legislature has expressly provided that the Department cooperate with Federal agencies so as to qualify for Federal aid, it was intended that he enact all rules and regulations necessary to meet compliance therewith. (See Ill. Rev. Stat. 1975, ch. 23, par. 12–4.5.) Contrary to defendant's assertion, Federal regulations do not require the State agency to have the authority to suspend or terminate vendors guilty of committing fraud or abuse. Federal regulations require only that the State plan provide for a method of identifying and reporting cases of suspected fraud. (45 C.F.R. sec. 250.80 (1976).) Pursuant to sections 12–4.2 and 12–4.5 of the Code, the legislature has granted defendant the necessary authority to investigate and report suspected fraud. Ill. Rev. Stat. 1975, ch. 23, pars. 12–4.2, 12–4.5.

Prior to 1972, the Secretary of Health, Education and Welfare did not have the authority to suspend or terminate vendors guilty of committing fraud or other abuses under the Medicare program. (1972 U.S. Code Cong. & Ad. News 4989, 5085.) In 1972, Congress vested the Secretary with this needed authority. In its report to Congress in 1972, the House Committee on Ways and Means specifically noted that "States can, and some do, bar from medicaid providers who abuse the program, but they are not now required to do so." (1972 U.S. Code Cong. & Ad. News 4989, 5085.) Section 1396b(i)(2) of the Federal "Grants to States for Medical Assistance Programs" provides for the termination of Federal payments to States for services furnished by a vendor under the Medicaid program if such vendor has been found guilty of committing fraud or abuse under the applicable provisions of the Federal Medicare program. (42 U.S.C. sec. 1396b(i)(2) (Supp. III 1973).) This section, however, does not require the State to terminate or suspend the vendor as a condition to the

State's further participation in the Federal program.

Defendant also argues that the express provisions of the Code, coupled with the Director's broad authority to make all rules and regulations "necessary or desirable for carrying out the provisions of [the] Code" (Ill. Rev. Stat. 1975, ch. 23, par. 12—13), implies the authority to suspend or terminate. The desirability of a regulation, however, must be distinguished from the power to promulgate it. This court has consistently held that, inasmuch as an administrative agency is a creature of statute, any power or authority claimed by it must find its source within the provisions of the statute by which it is created. (*City of Chicago v. Fair Employment Practices Com.* (1976), 65 Ill. 2d 108, 113; *Chicago Division of the Horsemen's Benevolent & Protective Ass'n v. Illinois Racing Board* , Ill. 407, 410. (1972), 53 Ill. 2d 16; *Pearce Hospital Foundation v. Illinois Public Aid Com.* (1958), 15 Ill. 2d 301, 307; *Hesseltine v. State Athletic Com.* (1955), 6 Ill. 2d 129, 131-32; *People ex rel. Polen v. Hoehler* (1950), 405 Ill. 322, 326-28; *People ex rel. Hurley v. Graber* (1950), 405 Ill. 331, 340-44, 346-48.) Further, when the legislature vests discretionary authority in an administrative officer, intelligible standards must be provided to guide the officer in the exercise of his discretion. *E.g., Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 59-60; *People v. Tibbitts* (1973), 56 Ill. 2d 56, 57-62; *Hill v. Relyea* (1966), 34 Ill. 2d 552, 555-56; *McDougall v. Lueder* (1945), 389 Ill. 141, 152-54.

In *Horsemen's Ass'n*, for example, certain racehorse owner associations brought suit against the Illinois Racing Board to challenge its authority to enact a rule prescribing, by schedule, the minimum fees to be paid jockeys. It was asserted that the board was without authority to regulate the jockeys' compensation. The Board argued that increased compensation would improve the quality of racing, and, therefore, the rule fell within its authority to

"prescribe rules, regulations and conditions under which all horse races shall be conducted." In sustaining the trial court's finding of no authority, this court stated:

> "There is no authority conferred in the language of the Act, and the absence from the statute of any standards, criteria or procedure for determining compensation confirms that no power to make such determinations was intended by the legislature to be given the Board." 53 Ill. 2d 16, 19.

In *City of Chicago v. Fair Employment Practices Com.* (1976), 65 Ill. 2d 108, an action was brought to challenge that commission's authority to award attorney fees to successful complainants. The Commission argued that the "description of the Fair Employment Practices Act and declaration of policy contained in it, when coupled with the section relating to remedies, demonstrate the legislative intent that the Commission have the authority to award attorney fees to successful complainants, for otherwise the economic level of persons typically suffering discriminatory treatment would preclude retaining counsel and financing proceedings under the Act." Despite this argument, the court held that, absent expressed authority, the Commission was without the power to award attorney fees. 65 Ill. 2d 108, 113.

An examination of the Code's provisions clearly indicates that defendant has been given no express authority to terminate or suspend vendors. Neither has the legislature provided any standards or criteria to suggest the grounds warranting termination or suspension. The expressed provisions relied upon by the defendant, aside from the broad, standardless grant of rule-making authority embodied in section 12—13 (Ill. Rev. Stat. 1975, ch. 23, par. 12—13), all relate to the Director's authority to regulate the quality and quantity of medical services for which payment may be authorized. (See Ill. Rev. Stat.

1975, ch. 23, pars. 5—4, 5—5.) None of these provisions permit or suggest that the Director of Public Aid has the authority to permanently suspend or terminate a vendor who pursuant to the Director's findings has committed an abuse of the program. Pursuant to the expressed provisions of the Code, any Medicaid vendor who is properly licensed (Ill. Rev. Stat. 1975, ch. 23, par. 5—8) and who complies with the Director's rules and regulations relating to record keeping, disclosure, dispensation of services, or rules concerning the quality and quantity of medical assistance for which payment may be authorized, is entitled to receive payment for services provided to Medicaid recipients. (See Ill. Rev. Stat. 1975, ch. 23, par. 5—5.) If there are current billing discrepancies for which no payment has been made, section 11—13 permits the Department to deny liability, withhold payment, and allow the vendor to contest the Department's liability in the Court of Claims. (Ill. Rev. Stat. 1975, ch. 23, par. 11—13.) With regard to past overpayments, section 12—16 (Ill. Rev. Stat. 1975, ch. 23, par. 12—16) specifically authorizes the Director to initiate a court action through the Attorney General for any claim or obligation arising under the Code.

Further evidence that the legislature did not intend the Director to have the authority now claimed can be found in section 12—4.2 (Ill. Rev. Stat. 1975, ch. 23, par. 12—4.2), which specifically authorizes the defendant to investigate fraud, but directs that such findings are to be referred to proper prosecutorial authorities for further action. Section 12—16, as related above, delegates to the Attorney General the authority to prosecute all necessary court actions to enforce all claims, penalties and obligations arising under the Code or other State law. (Ill. Rev. Stat. 1975, ch. 23, par. 12—16.) We find that the total absence of standards, criteria or procedures for terminating or suspending vendors, coupled with the express delegation of enforcement responsibilities, is persuasive evidence that

the legislature did not intend to confer on the defendant the authority now claimed. We share the defendant's concern over the need to rid the public welfare program of abuse and fraud but, in light of the legislature's express statutory provisions, we cannot, by the process of mere implication, judicially legislate the results desired by the defendant.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

MR. JUSTICE DOOLEY, dissenting:

Although the majority purports to "share the defendant's concern over the need to rid the public welfare program of abuse and fraud" (68 Ill. 2d at 554), its tortuous construction of the Federal Medicaid program (42 U.S.C. sec. 1396 *et seq.* (1970)) and the Illinois Public Aid Code (Ill. Rev. Stat. 1975, ch. 23, par. 1—1 *et seq.*) sanctions plaintiff's concealment of its financial records and at the same time compels the Department of Public Aid to keep open the public purse. Affirming the plaintiff laboratories' right to an injunction, in my opinion, condones Medicaid gouging and obfuscates established concepts of administrative law.

It is clear that (1) the plaintiff was "without standing" to maintain this action under the circumstances; (2) there was no controversy capable of adjudication in this posture of the case; (3) the defendant's regulation authorizing the suspension from the Medicaid program of vendors for fraud or abuse was within its authority conferred by the Public Aid Code; and (4) no right to the extraordinary remedy of injunction existed.

To put the issues in focus, consider at the outset the Federal and State medical assistance programs. Under the Federal Medicaid program participating States must comply with the rules and regulations promulgated by the

Department of Health, Education and Welfare. (45 C.F.R. sec. 250.18 *et seq.* (1976).) Failure to do so may result in the withholding of Federal funds from the State. (45 C.F.R. sec. 201.6 (1976).) Every State participating in the Medicaid program must provide for agreements with persons providing medical services under which such persons agree to maintain records necessary to fully disclose the extent of services provided and to furnish the State with information regarding any payments claimed by such medical provider as the State may from time to time request. (45 C.F.R. sec. 250.21 (1976).) The State must take whatever measures are necessary to assure proper auditing of records. 45 C.F.R. sec. 250.30(a)(3)(ii)(F) (1976).

The Federal rules provide that a complete investigation of complaints of fraud or abuse must continue until resolved. (45 C.F.R. sec. 250.80(b)(2) (1976).) Such resolution may include "[s]uspending the provider from participation in the Medicaid program." 45 C.F.R. sec. 250.80(b)(2)(ii)(B) (1976).

To facilitate Illinois' participation in the Medicaid program, the Illinois Public Aid Code was amended by an addition to article V, entitled "Medical Assistance" (Ill. Rev. Stat. 1975, ch. 23, par. 5—1 *et seq.*). In numerous provisions of article V the legislature expressly delegates to the State agency (Department of Public Aid) the power to carry out specified functions involved in the medical assistance program by rule and regulation. More particularly, section 5—5 (Ill. Rev. Stat. 1975, ch. 23, par. 5—5) provides that the Department, by rule, shall determine the quantity and quality of the medical assistance for which payment will be authorized. Section 5—9 (Ill. Rev. Stat. 1975, ch. 23, par. 5—9) conditions entitlement to reimbursement to medical vendors on compliance with the rules and regulations of the Illinois Department of Public Aid.

Section 12—4 and following sections of the Code

enumerate the powers and duties of the Illinois Department of Public Aid. Section 12—4.2 (Ill. Rev. Stat. 1975, ch. 23, par. 12—4.2) empowers the Department "to investigate all matters pertaining to the fraudulent obtainment of public aid" and expressly includes vendors as proper subjects of investigation. Section 12—4.5 (Ill. Rev. Stat. 1975, ch. 23, par. 12—4.5) requires the Department to cooperate with the Federal government, in any reasonable manner not contrary to the Code, as may be necessary to qualify for Federal aid. Section 12—13 (Ill. Rev. Stat. 1975, ch. 23, par. 12—13) expressly delegates to the Department the power to *"make all rules and regulations* and take such action as may be necessary or desirable for *carrying out the provisions* of this Code, to the end that its *spirit and purpose may be achieved and the public aid programs administered efficiently throughout the State."* (Emphasis added.)

Pursuant to section 12—13 of the Code, defendant Trainor, Director of the Illinois Department of Public Aid, promulgated certain official rules and regulations. These included the suspension or termination of unqualified medical vendors who have defrauded or otherwise abused their participation in this Federal-State program.

It is under this Federal-State medical assistance program that this case arises. Plaintiff Bio-Medical Laboratories, Inc., doing business as Gerson Clinical Laboratories, was granted permission to participate in the Illinois Medical Assistance Program (Medicaid) in 1969, and has continued to participate.

After it was discovered that the Department of Public Aid's reimbursements to plaintiff increased 58% over a three-month period, the Department appropriately ordered an audit under the mandate of the Federal requirements and the State Code. The audit was to cover the period January 1975 through June 1976. On November 24, 1976, defendant's chief assistant notified the laboratory that if it

failed to submit certain business records to the Department as required by the rules within 15 days, the laboratory would not be allowed to participate in the Medicaid program. Two days later representatives of defendant and the laboratory conferred and reached an agreement regarding the duty of the laboratory to disclose certain records. After that agreement, defendant notified the laboratory that no further action would be taken pursuant to the Department's threat of suspension.

On November 30, 1976, the Department's auditors filed their report with the Director citing certain discrepancies in the laboratory's billing procedures which had resulted in overpayment of $9,990.75. The audit, based upon a sample of the bills, disclosed that the laboratory had nine different types of billing discrepancies. The laboratory admits that it engaged in sequential billing, which is not only impermissible, but exceeded the State payment schedule.

In the absence of the laboratory's records, which it refused to make available, the auditors, by extrapolation, determined that an estimated $321,291.60 in overpayments had been made to the laboratory during an 18-month period. The alleged improper billing procedures, and the laboratory's refusal to turn over records for audit required by law, caused the Department's auditors to recommend to the Director of Public Aid that the laboratory be suspended from further participation as a Medicaid vendor and that action be taken to recoup the overpayments.

But before any such administrative action was taken—and here it must be emphasized that the record on appeal indicates that Gerson Clinical Laboratories was never served with a notice of intent to terminate its status as an authorized medical vendor—the laboratory instituted this independent proceeding in the courts for an injunction against the Illinois Director of Public Aid, alleging that

defendant "intended" to suspend plaintiff from the program. Defendant's motion to dismiss the injunction suit was supported by an affidavit that Trainor had taken no official action to implement the auditors' recommendations; that any future action taken by the Department would be subject to the Department's rules and regulations; and that the laboratory would not be terminated as a participating vendor until procedural requirements under those rules had been met.

Yet the trial court granted a temporary restraining order. The cause, for some unknown reason, was transferred to another judge. Defendant's motion to dismiss the injunction proceeding was then denied on the ground that defendant was without authority to proceed administratively under its rules providing for suspension of unqualified medical vendors who have defrauded or otherwise abused their participation in the Federal-State program.

I vigorously disagree with the majority's summary dismissal of the threshold administrative law issues of "standing" and "ripeness."

The doctrine of "standing" is a basic principle of administrative law. It is designed to insure that the party seeking relief from administrative action has a personal stake in the outcome of the controversy, and that the challenged action has caused him injury in fact, financial or otherwise. *Sierra Club v. Morton* (1972), 405 U.S. 727, 31 L. Ed. 2d 636, 92 S. Ct. 1361; *Association of Data Processing Service Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 25 L. Ed. 2d 184, 90 S. Ct. 827.

Here, at the time plaintiff filed suit for an injunction, it had in no way, financially or otherwise, been aggrieved by administrative action. Plaintiff was merely being required to submit its records for investigation as required by law. It is undisputed that plaintiff had not been served with any notice of intent to terminate its status as a Medicaid vendor. The majority regards that fact as

involving the issue of "ripeness" rather than "standing." In my judgment the absence of any adverse administrative action causing plaintiff financial or other injury also affects the issue of "standing." It can only be assumed that plaintiff realized that if it supplied the Department of Public Aid with the information to which it was entitled under the law, the records would show that plaintiff had overcharged the Department. Hence, plaintiff would be suspended as a Medicaid vendor, and an action would lie against it for the overcharge.

There has been no interruption of an existing relationship between the Department of Public Aid and the plaintiff, as in *Gonzalez v. Freeman* (D.C. Cir. 1964), 334 F.2d 570, 574, relied on by the majority. To the contrary, the affidavit of the Director of Public Aid specifically states that the relationship is ongoing and would not be terminated until all procedural requirements had been met. I fail to perceive that plaintiff, by virtue of being investigated, is deprived of an ongoing relationship sufficient to entitle it to "standing."

Even if one were to assume that plaintiff could establish "standing" by virtue of the pending recommendations of defendant's auditors for suspension because of discrepancies in plaintiff's billing procedures resulting in substantial overpayments, and for plaintiff's refusal to permit the audit of its records as required by law, there still exists the separate and distinct threshold issue of "ripeness," *i.e.*, whether a case or controversy exists, capable of adjudication. The majority fails to differentiate between these distinct administrative law concepts. It merely concludes that the concept of "ripeness" applies in our case by analogy to *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515.

The "ripeness doctrine" requires final administrative action before a case challenging administrative action can

be reviewed by the court. This doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515.

The *Abbott Laboratories* case involved both an amendment to the Federal Food, Drug and Cosmetic Act (21 U.S.C. sec. 301 *et seq.*) and a Federal regulation. The Federal law required manufacturers of prescription drugs to print the "established name" of the drug prominently and in type at least half as large as that used thereon for any "proprietary name" for such drug. The Commissioner of Food and Drugs, exercising authority delegated to him, promulgated certain regulations designed to implement the Federal statute. Amongst these was the following: " 'If the label or labeling of a prescription drug bears a proprietary name or designation for the drug or any ingredient thereof, the established name, if such there be, corresponding to such proprietary name or designation, shall accompany each appearance of such proprietary name or designation.' (21 C.F.R. sec. 1.104(g)(1).)" (387 U.S. 136, 138, 18 L. Ed. 2d 681, 685-86, 87 S. Ct. 1507, 1510.) A similar rule was made applicable to advertisements for prescription drugs. The court held that the issues presented were appropriate for judicial resolution at that time. It emphasized:

> "First, all parties agree that the issue tendered is a purely legal one: whether the statute was properly construed by the Commissioner to require the established name of the drug to be used *every time* the proprietary name is employed. Both sides moved for summary judgment in the District

Court, and no claim is made here that further administrative proceedings are contemplated. ***

Second, the regulations in issue we find to be 'final agency action.' " (Emphasis in original.) 387 U.S. 136, 149, 18 L. Ed. 2d 681, 691-92, 87 S. Ct. 1507, 1515-16.

The mere recital of the basis of the decision shows its inapplicability as a precedent for this case. Here there has been no final administrative action—at most an aborted investigation in which the plaintiff refused to make its records available as required by law. The facts are highly controverted—just what services did the plaintiff render, and how much did plaintiff overcharge the Department of Public Aid. There is no agreement between the parties that the case involves only the resolution of a legal issue as there was in *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 18 L. Ed. 2d 681, 87 S. Ct. 1507.

Those distinguishing factors are entirely overlooked by the majority. It apparently did have some difficulty with the concept of "ripeness" in view of its statement: "Absent defendant's announced intention, we would agree that plaintiff's action was premature." (68 Ill. 2d at 546.) The court then concluded that "[d]efendant's threat of action, however, along with the recommendation of the auditors, constituted a sufficient final determination to warrant judicial consideration." 68 Ill. 2d at 546.

Just what threat did defendant make? The majority divines the "threat" from the allegations in plaintiff's complaint "that defendant, James Trainor, has informed the plaintiff that he intends to forthwith suspend the plaintiff from the Public Aid Program." (68 Ill. 2d at 545.) Such allegation was expressly rebutted by defendant's unequivocal assertion in his affidavit in support of his motion to dismiss that he took no official action to implement the auditors' recommendation. The record on review includes all the pleadings and supporting docu-

ments. It is undisputed that plaintiff was never served with any "Notice of Intent" to terminate its status as an authorized Medicaid vendor; nor was plaintiff in any way informed that defendant intended to suspend it from the program. Just how can recommendations, which are merely advisory to the Director, be deemed final agency action? That assumption is specifically negated by defendant's affidavit stating that any action taken by the Department would be in accordance with the Department's rules and regulations, and that plaintiff would not be terminated until procedural requirements had been satisfied. In no way can this case be deemed to present "final agency action," a determinative factor in the *Abbott Laboratories* decision.

Under this analysis of the record, the administrative law doctrine of "ripeness" was violated by plaintiff. This is a classic example of the reason for the "ripeness doctrine," which is "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way." (*Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515.) For that reason alone the case should be dismissed and the injunction dissolved.

There is, however, an even more cogent reason for dismissal. This goes to the merits of the case. It goes to the determination of whether the defendant's regulation authorizing suspension or termination from participation of vendors for fraud or abuse of their participation in the Medicaid program was within the express or implied authority of the Code.

The regulation must be viewed in the context of the Federal-State Medicaid program under which it was promulgated. I have alluded to the applicable Federal statutes and regulations pertaining to State participation in the Medicaid program and to the provisions of the Illinois Public Aid Code. These show that in order to be a

participant in the Federal medical assistance program and receive Federal funds, the State of Illinois must comply with the rules and regulations promulgated by the Department of Health, Education and Welfare, otherwise Federal funds must be withheld; that Illinois must include in its agreements with persons providing medical services a requirement that they maintain records necessary to fully disclose the extent of the services provided and furnish the State with information regarding any payments made or claims by such medical provider as the State may request; and that the Department of Public Aid must take whatever measures are necessary to assure appropriate auditing of records.

Section 5—9 of the Public Aid Code conditions eligibility of medical vendors, such as plaintiff, to participate on compliance with the rules and regulations of the Department of Public Aid, and section 5—5 requires all dispensers of medical services to keep records in accordance with regulations promulgated by the Department. Section 12—4 and following sections empower the Department to investigate fraudulent obtainments of public aid, including payments to vendors.

As previously noted, the Code is replete with express delegations of rule-making power, the most comprehensive of which is section 12—13, which confers on the Department of Public Aid power to make all rules and regulations "as may be necessary or desirable for carrying out the provisions of this Code to the end that its spirit and purpose may be achieved and the public aid programs administered efficiently throughout the State."

The controverted rule terminating a vendor's participation in the Medicaid program was promulgated after congressional action. Congress gave the Secretary of Health, Education and Welfare authority to suspend or terminate vendors guilty of committing fraud or other abuses under the Medicare program. Congress further

provided for termination of Federal payments to States for services furnished by a vendor under the Medicaid program if such vendor has been found guilty of committing fraud or abuse under applicable State law. 42 U.S.C. sec. 1396b(i)(2) (Supp. III 1973).

The majority opinion interprets that legislative history as indicating that since Congress did not require the States to suspend Medicaid vendors, no such power can be implied. There is another interpretation.

In my judgment, that legislative history should strengthen the resolve of this court to sustain the contested rule, since it effectuates Federal policy and would prevent Illinois from losing Federal funds. If investigations of fraud or abuse by medical vendors can be stymied by the tortured construction of the Public Aid Code, as the majority has done, so as to permit injunctions to hamstring administrative investigations of vendors who would gouge the public purse, it takes no occult power to anticipate that Federal funds would be required by Federal law to be withheld from Illinois. 45 C.F.R. sec. 201.6 (1976).

The majority, in denying the validity of the rule in question, disregards the fact that vendor participation, whether initial or continued, is not prescribed in the Code. If the Department of Public Aid can provide by rule who are qualified vendors, it can also provide by rule who are disqualified from further participation by reason of their overcharging the State, or failing to comply with rules of the Department of Public Aid.

The majority further finds the rule objectionable because it vests discretionary authority in an administrative officer without intelligible standards as guides. In my judgment there were intelligible standards for the rule-making power—such standards as the United States Supreme Court has recognized as sufficient in adjudging the propriety of administrative action.

In *Mourning v. Family Publications Service, Inc.* (1973), 411 U.S. 356, 36 L. Ed. 2d 318, 93 S. Ct. 1652, the court sustained a regulation involving a consumer credit disclosure requirement promulgated by the Federal Reserve Board under section 105 of the Truth in Lending Act (15 U.S.C. sec. 1604 (1970)). The Supreme Court held that Congress, in enacting the Truth in Lending Act, had validly delegated broad authority to the Board to promulgate all regulations reasonably necessary to insure that the objectives of the Act were fulfilled and entrusted its construction to an agency with the necessary experience and resources to monitor its operation. In considering the validity of regulations promulgated pursuant to such broad authority, the court stated:

> "The standard to be applied in determining whether the Board exceeded the authority delegated to it under the Truth in Lending Act is well established under our prior cases. Where the empowering provision of a statute states simply that the agency may 'make \*\*\* such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.' " (Footnote omitted.) 411 U.S. 356, 369, 36 L. Ed. 2d 318, 330, 93 S. Ct. 1652.

See also K. Davis, Administrative Law of the Seventies sec. 2.17, at 39 (1976); *Thorpe v. Housing Authority* (1969), 393 U.S. 268, 280-81, 21 L. Ed. 2d 474, 483, 89 S. Ct. 518, 525.

The standard set forth in section 12—13 of the Code is certainly no less detailed than that involved in the *Mourning* case. That section of the Code delegates to the Department of Public Aid the power to "make all rules and regulations and take such action as may be necessary

or desirable for carrying out the provisions of this Code, to the end that its spirit and purpose may be achieved and the public aid programs administered efficiently throughout the State." Ill. Rev. Stat. 1975, ch. 23, par. 12—13.

It is patent that the contested regulation here providing for suspension from the Medicaid program of unqualified medical vendors who have defrauded or otherwise abused their participation under the Medicaid program is reasonably related to the purpose of the Code. It is designed to abet the administration of the program by effectuating the mandated authority to inspect and audit records of participating vendors and ferret out those who abuse or defraud the Department.

The relationship between the rule and the purpose of the Code is highlighted by a view of the concrete realities. In fiscal year 1976 the total Medicaid expenditure in Illinois was in excess of $868,000,000 and the amount budgeted for fiscal year 1977 is approximately $912,000,000, of which approximately 50% comes from the Federal government, according to the affidavits filed by defendant. Under the implementing regulations of the Federal Medicaid program, Illinois must take steps to identify situations which may involve fraud in its Medicaid program and eliminate fraudulent vendors from the system. (45 C.F.R. sec. 250.80(a)(1) (1976).) Failure to do so can lead to a withholding of the Federal government's contribution to Illinois Medicaid costs. A regulation designed to ferret out such abuse is related to the purpose of the enabling legislation.

There is no issue here that plaintiff was, or would be, arbitrarily deprived of its participation in the Medicaid program by administrative action. At the time plaintiff filed suit for the injunction, no official administrative action had been taken. However, had such action been taken, it would have been in accordance with the Department's published rules and regulations governing

vendors. They provide for notice and the right to a formal administrative review of decisions to withhold payments or terminate participation. (Rules of Practice in Administrative Proceedings, Department of Public Aid, Medical Assistance Program Reviews, Rules 503.02, 503.03, 504.03.) Official action adversely affecting a vendor may not be taken without notice and, if requested, a hearing into the charges against the vendor. Under these circumstances I fail to perceive the hardship inflicted upon the plaintiff which gives it the right to negate the administrative machinery of the Illinois Medicaid program.

That the Code authorizes prosecutional authorities to take court action certainly cannot preclude the administrative agency from exercising its rule-making powers for the effective administration of the Code. If the public purse must be kept open until a conviction of fraud can be finalized, while vendors proceed to overcharge the Department and flaunt the Department's express power to investigate and its mandate to audit such vendors, then the Department cannot carry out the stated purpose of administering efficiently the public aid programs.

Lastly, it is established law that injunction is an extraordinary remedy. It is an even more extraordinary remedy when it is invoked, absent any emergency, against an administrative agency even before final agency action. And it is legally indefensible when that injunctive remedy is granted to a plaintiff whose allegedly illegal actions of refusing to disclose its records as required by law make impossible the orderly operation of the administrative process. For these many reasons I am compelled to disagree with the majority opinion.