A. E. STALEY MANUFACTURING COMPANY *et al.*, as the Industrial Energy Consumers (IIEC), Petitioners, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

Fourth District   No. 4—87—0405

Opinion filed February 11, 1988.

GREEN, P.J., dissenting.

Randall Robertson and Edward C. Fitzhenry, Jr., both of Lueders, Robertson & Konzen, of Granite City, for petitioners.

Neil F. Hartigan, Attorney General, of Springfield (Steven G. Revethis and Douglas W. Trabaris, Special Assistant Attorneys General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Robin J. Talbert, of Land of Lincoln Legal Assistance Foundation, of Alton, for respondent Vivian Flowers.

Gary Palm, of Mandel Legal Aid Clinic, of Chicago, for respondents South Austin Coalition Community Council, Action Coalition of Englewood, and Northwest Community Organization.

William Herrmann, of Governor's Office of Consumer Services, of Chicago, and Roger D. Colton, of National Consumer Law Center, of Boston, Massachusetts, for *amicus curiae.*

JUSTICE LUND delivered the opinion of the court:

The Illinois Commerce Commission (Commission) entered into a rulemaking proceeding pursuant to section 5.01 of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1985, ch. 127, par. 1005.01) in order to amend the rules implementing the Energy Assistance Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1301 *et seq.*). Petitioners, the Illinois Industrial Energy Consumers (industrials), as well as others, intervened in the proceeding and submitted written comments. The proposed rule was revised by the Commission but not as requested by the industrials. After denial of an application for rehearing, the industrials appealed directly to the appellate court pursuant to section 10—201 of the Public Utilities Act (Ill. Rev. Stat., 1986 Supp., ch. 111⅔, par. 10—201).

The Energy Assistance Act (Act) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1301 *et seq.*) directs the Commission, in part, to establish a program for providing affordable utility service to low-income persons.

The Commission designated the program the "Illinois Residential Affordable Payment Program" (IRAPP). Persons who qualify for the IRAPP program will not have their public utilities service terminated. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1)(c).) In order to qualify, an individual must agree to pay a portion of his or her income for utility service during the winter months. During the summer months, participants must pay the current bill plus a portion of any outstanding debt. Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1)(b).

The Act also provides for public funds to be applied if participants do not bear the full cost of their utility usage. Section 4(1)(e) of the Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1304(1)(e)) states, in relevant part:

"To the extent there is a difference between payments received from customers participating in the program and actual amounts incurred for utility heating or electric service rendered, the utility shall apply all energy assistance funds received on behalf of participating customers, including Illinois Home Energy Assistance Program Funds, oil overcharge refunds to the extent allowed by federal law, relevant public aid funds and any and all other such State and federal funds which become available, to such shortfall in order to reduce or eliminate it."

The Act gave the Commission the power to issue any rules necessary to effectively implement the IRAPP program. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1306.) The rules promulgated by the Commission include section 281.60 of the Illinois Administrative Code (83 Ill. Adm. Code 281.60 (1986)) created to implement section 4(1)(e) of the Act. As originally adopted in April 1986, section 281.60 stated:

"(a) To the extent there is a difference between payments received from a customer participating in the program and actual amounts incurred by that customer for utility heating or electric service rendered, the utility shall apply all energy assistance funds received on behalf of that customer to any shortfall in order to reduce or eliminate it.

(b) Any energy assistance funds received on behalf of a customer shall first be credited toward a customer's shortfall, if any, then to any arrearages. Energy assistance funds shall include Illinois Home Energy Assistance Program Funds, oil overcharge refunds to the extent allowed by federal law, relevant public aid funds and any and all other such state and federal funds which become available." (Emphasis omitted.) (83 Ill. Adm. Code 281.60 (1986); 10 Ill. Reg. 7711, 7722 (1986).)

The Commission began a rulemaking proceeding in August 1986 in order to amend the rules implementing the Act. The final amendment to section 281.60 added paragraph (c):

> "No utility may require payment by any individual, at any time, of any amount attributable to shortfall incurred by that individual as a result of participation in the program established under this Part. The utility shall maintain the shortfall amount on each participating customer's account so that energy assistance funds may be applied to it as required by Section 281.60(a)." (Emphasis omitted.) (83 Ill. Adm. Code 281.60(c) (1987); 11 Ill. Reg. 7945, 7952 (1987).)

The industrials intervened in the rulemaking proceeding and submitted comments directed at section 281.60(c). The Commission did not modify the rule as requested by the industrials, and the rule was adopted on April 1, 1987, by the Commission as above quoted. After denial of a rehearing, the industrials filed this appeal.

The main question raised by the industrials is whether section 281.60(c) violates the authority of the Act. The industrials argue section 281.60(c) absolves participants of the program from paying any shortfall created by the program. By implication, the rule places the burden for shortfall on the nonparticipating customers, such as the industrials. Indeed, from the comments submitted in the rulemaking proceeding, all parties acknowledge that a likely result of the creation of section 281.60(c) will be an increased cost to nonparticipating customers if a sufficiently large shortfall occurs. The industrials argue placing the burden for any such shortfall that arises on nonparticipating customers only violates the legislature's purpose for creating the Act.

■ We need not address the questions raised by the industrials because, as certain of the respondents argue, the questions are not ripe for adjudication.

> "The basic rationale of the ripeness doctrine as it relates to challenges against unlawful administrative action 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 546, 370 N.E.2d 223, 226, quoting *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515.)

Ripeness involves a two-step test: (1) an evaluation of the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. (*Abbott Laboratories*, 387 U.S. at 149, 18 L. Ed. 2d at 691, 87 S. Ct. at 1515.) This test has been followed by courts in Illinois. (*Peoples Energy Corp. v. Illinois Commerce Comm'n* (1986), 142 Ill. App. 3d 917, 934, 492 N.E.2d 551, 564; *Alfred Engineering, Inc. v. Illinois Fair Employment Practices Comm'n* (1974), 19 Ill. App. 3d 592, 600, 312 N.E.2d 61, 67.) The first step of the test, the fitness of the issues for judicial determination, relates to the posture of the proceedings before the agency. In this case, the agency has issued a final order regarding the rule, and the Public Utilities Act provides for an appeal of such an order. Thus, there is a final agency determination. Further, the industrials raised the question of "whether the regulation is totally beyond the agency's power under the statute, the type of legal issue that courts have occasionally dealt with without requiring a specific attempt at enforcement." (*Toilet Goods Association, Inc. v. Gardner* (1967), 387 U.S. 158, 163, 18 L. Ed. 2d 697, 701, 87 S. Ct. 1520, 1524.) The first step of the test is, thus, satisfied. The appeal falls on the second step, the possibility of harm to the industrials should this court dismiss the appeal.

The seminal cases on the doctrine of ripeness are a trilogy decided together by the United States Supreme Court. In *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 18 L. Ed. 2d 681, 87 S. Ct. 1507, a consortium of prescription drug manufacturers brought an action for declaratory and injunctive relief against the Secretary of Health, Education and Welfare to prohibit the use of a regulation requiring "the established name" of a prescription drug to appear on the label along with "the proprietary name or designation." (387 U.S. at 137-39, 18 L. Ed. 2d at 685-86, 87 S. Ct. at 1509-10.) After announcing the two-step test for ripeness, the court held the action brought by the drug manufacturers ripe for adjudication. With respect to the second step of the test, the court stated the rule put the manufacturers in a dilemma; they were required to comply with the rule and incur the cost of changing therewith or face the risk of being sanctioned through the use of criminal and civil penalties for noncompliance. 387 U.S. at 152-53, 18 L. Ed. 2d at 693-94, 87 S. Ct. at 1517.

In *Toilet Goods Association, Inc. v. Gardner* (1967), 387 U.S. 158, 18 L. Ed. 2d 697, 87 S. Ct. 1520, the Supreme Court followed the two-step test in holding the appeal in that case not ripe for adjudication. An organization of cosmetics manufacturers sought to en-

join enforcement of a Health, Education and Welfare regulation that permitted the Commissioner of Food and Drugs to suspend certification services for refusal to allow Food and Drug Administration employees access to manufacturing facilities, processes, and formulae with regard to the production of color additives. In holding the appeal was not ripe, the court emphasized the fact that nothing was immediately required of cosmetics manufacturers. The regulation merely authorized the Commissioner of Food and Drugs to suspend certification services to a particular manufacturer. The suspension could be challenged by administrative appeal, and would eventually be subject to judicial review. The regulation imposed no current hardship on the manufacturers. It made no difference in the day-to-day affairs of cosmetics manufacturers until such time as the Commissioner sought to enforce it. Until that time, it was unclear in what manner the regulation would be enforced by the Food and Drug Administration. 387 U.S. at 163-65, 18 L. Ed. 2d at 701-03, 87 S. Ct. at 1524-25.

The third case is *Gardner v. Toilet Goods Association* (1967), 387 U.S. 167, 18 L. Ed. 2d 704, 87 S. Ct. 1526. In that case, the court found an appeal of a Health, Education and Welfare rule ripe for adjudication because the rule required immediate action on the part of manufacturers for compliance. If complied with, the manufacturers would be required to expend considerable sums of money, as well as time, for record keeping and scientific testing. 387 U.S. at 172-73, 18 L. Ed. 2d at 708-09, 87 S. Ct. at 1529.

In the instant case, the industrials will suffer no direct harm by the promulgation of section 281.60(c). There are several contingencies which must occur before the industrials will bear the burden of any shortfall created by the energy assistance program. The legislature has appropriated $40 million to pay for any shortfall that arises under the IRAPP program. (Pub. Act 84—1226 (§2.3), eff. July 1, 1988; 1986 Ill. Laws 1095.) This must be exhausted before the costs of the program extend to normal rate-paying utility customers. According to statistics published by the IRAPP staff and submitted to us by respondents, the shortfall for the program which terminates January 1, 1989, will, in all likelihood, not exceed $40 million. Further, the legislature may act to appropriate more public funds to meet any unexpected increase in the shortfall. Finally, before the costs will be passed on to the industrials, the utilities will need to receive Commission approval to raise rates. At such a time, the effect to the industrials of section 281.60(c) will be concrete. Any adverse decision received by the industrials in that administrative proceeding

is subject to judicial review. (Ill. Rev. Stat., 1986 Supp., ch. 111²/₃, par. 10—201.) In sum, there is currently no hardship imposed on the industrials, and the likelihood of a future burden being imposed on the industrials is dependent on several contingencies.

The appeal is ordered dismissed as it is not ripe for adjudication.

Appeal dismissed.

SPITZ, J., concurs.

PRESIDING JUSTICE GREEN, dissenting:

I would not refrain from deciding the case on the basis that the damage to petitioners is very contingent. They maintain: (1) the rule in question is invalid; (2) it prevents the utilities from collecting charges to which they are entitled and, at least a substantial portion of which, are collectible; (3) a shortfall in the funds provided by the IRAPP program is likely to occur; and (4) the utilities will charge petitioners and other non-IRAPP users higher rates to make up for the charges they are prevented by the rule from collecting and for which reimbursement will not be made from IRAPP funds. If petitioners are correct that the rule is invalid and no action is permitted to test the validity of the rule until a shortfall does occur, the time will have then passed when the damage petitioners fear can be prevented because the funds the utilities are now prevented by the rule from collecting will, most likely, be uncollectible by then.

The utilities are entitled to a reasonable return on their investment. The rates the Commission will be required to permit the utilities to charge to make a reasonable return will be higher if the utilities are deprived of revenue by the rule. I realize the impact of the rule on the revenue of the utilities and subsequent rates charged by the utilities may be small. However, I deem the possible damage to petitioners by waiting is sufficient to bestow ripeness upon the case. I would decide the case on its merits.