BIG RIVER ZINC CORPORATION *et al.*, Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

Fifth District No. 5—91—0067

Opinion filed July 30, 1992.

Edward C. Fitzhenry, Jr., and Eric Robertson, both of Lueders, Robertson & Konzen, of Granite City, for petitioners.

Roland W. Burris, Attorney General, of Springfield (David L. Nixon, Special Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Joseph H. Raybuck, of St. Louis, Missouri, for respondent Union Electric Company.

JUSTICE HARRISON delivered the opinion of the court:

The Illinois Industrial Energy Consumers (IIEC), a consortium of industrial users of electricity, appeals to this court for administrative review of an order entered by the Illinois Commerce Commission (Commission) on November 20, 1990, adopting an energy plan filed by Union Electric (UE) pursuant to section 8—402(c) of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 8—402(c)) and title 83,

section 440, of the Illinois Administrative Code (83 Ill. Adm. Code §440 (1991)). On this appeal, IIEC challenges only that part of the order which "approved in concept" UE's proposal to implement a "rider" to recover research and development costs associated with "demand-side management programs." For the reasons which follow, we hold that the propriety of the Commission's views on the use of riders to recover demand-side energy costs is not yet ripe for judicial review. Accordingly, this appeal shall be dismissed.

■ Section 8—402(c) of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402(c)) provides that every two years each public utility providing energy services is required to file an energy plan with the Department of Energy and Natural Resources and the Commerce Commission. That energy plan is required to include, among other things, a demonstration that it represents "the least-cost means of satisfying energy service needs consistent with the objectives of [the Public Utilities Act]." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402(d)(iii).) Pursuant to a previous order of the Commerce Commission adopting a comprehensive utility energy plan for the State of Illinois (see Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402(b)), public utilities have also been directed to investigate "demand management programs that will enable them to defer the need for additional generating capacity over the planning horizon in a cost effective manner." *Re Comprehensive Electric Energy Plan* (Illinois Commerce Commission, Oct. 6, 1989), 106 PUR 4th 349, 372.

In conjunction with this requirement, the Commerce Commission has directed the utilities to develop as part of their individual energy plans "proposals for the recovery of prudently-incurred costs associated with analysis, design and implementation of demand-side programs." (106 PUR 4th at 374.) According to the Commission,

"[b]ased upon these proposals and other such information as the Commission deems necessary and appropriate, the Commission shall determine the method(s) of cost recovery appropriate for use by the utilities. Further, the Commission formally states its intention to provide for full recovery of prudently-incurred costs associated with demand-side analysis and programs. Further, the Commission formally acknowledges a potential barrier to implementing demand-side programs represented by the potential for lost revenue, and utilities are hereby directed to include in their proposals for cost recovery proposals for reducing their potential barrier." (106 PUR 4th at 374.)

These provisions regarding proposals for recovery of costs for demand-side analysis and programs were included in the Commerce

Commission's previous order by stipulation of the parties to the earlier proceeding. Among those parties was IIEC, the appellant in this case.

UE duly filed its energy plan with the Commerce Commission on January 8, 1990, to comply with the foregoing requirements and directives. That plan did not include a specific proposal for recovery of costs for demand-side programs but did urge that a "rate adjustment mechanism for recovery of expenses incurred in demand-side capability building, data collection, and test programs should be developed to allow for recovery of such costs immediately." In subsequent proceedings regarding UE's proposed energy plan, a representative of that utility provided a more detailed response. He testified that what UE had in mind was recovery of its "research and development expenses for capability building for demand-side programs" using "a rider similar to the fuel adjustment charge" which would be charged to all customers on a kilowatt-hour basis. In his testimony, the UE representative did not ask the Commission to approve a rider at that time. Rather, he requested approval only of "the concept of a rider."

The "fuel adjustment charge" alluded to by UE's representative is authorized by section 9—220 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220). That statute provides that

> "the Commission may authorize the increase or decrease of rates and charges based upon changes in the cost of fuel used in the generation or production of electric power, changes in the cost of purchased power, or changes in the cost of purchased gas through the application of fuel adjustment clauses or purchased gas adjustment clauses." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220.)

Basically, what such "adjustment clauses" do is permit utilities to pass along to consumers changes in certain, specified costs without requiring the utilities to initiate formal rate-making proceedings under section 9—201 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—201) each time the rates are changed.

The significance of this becomes apparent when one considers that under section 9—201, a public utility cannot change the rates it charges without first filing a proposed rate schedule with the Commerce Commission "stating plainly the change or changes to be made." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—201(a).) The propriety of proposed change or changes is then subject to review by the Commission. In determining whether a utility should be permitted to alter the rates it charges to its customers, the Commission looks not only at the utility's operating costs but also its rate base and its allowed

rate of return. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 200, 529 N.E.2d 510, 512.) Ratemaking determinations are done in the context of a "test year" (124 Ill. 2d at 201, 529 N.E.2d at 513; 83 Ill. Adm. Code §285.150 (1991)), detailed filing requirements must be met by the utility (see 83 Ill. Adm. Code §285.110 *et seq.* (1991)), and the proposed rate changes must be "just and reasonable" (see Ill. Rev. Stat. 1989, ch. 111²/₃, pars. 9—101, 9—201(c)).

IIEC opposed the rider proposal. Its expert, Dr. Alan Rosenberg, testified that the rider was unnecessary and constituted poor regulatory practice. All other parties, however, supported the use of a rider. As we indicated earlier in this disposition, the Commerce Commission ultimately approved UE's energy plan. In its order granting that approval, the Commission expressly endorsed the concept of a rider for a recovery of demand-side management costs. From that portion of the Commission's order, IIEC now appeals.

■ We shall not reach the merits of this appeal, for there is one preliminary matter which prevents us from going forward. The Commerce Commission has argued that the appeal should be dismissed because the question of whether riders may be used for recovery of demand-side management costs is not yet ripe for review. We agree. The ripeness doctrine has been developed by the Federal courts. It emanates from the case-or-controversy clause of article III of the Federal Constitution (U.S. Const., art. III), which limits the Federal court's subject matter jurisdiction. (*St. Clair v. City of Chico* (9th Cir. 1989), 880 F.2d 199, 201, *cert. denied* (1989), 493 U.S. 993, 107 L. Ed. 2d 539, 110 S. Ct. 541.) Although the courts of this State are not subject to the case-or-controversy limitation of article III (U.S. Const., art. III), we are bound by a similar restriction. Under State law, courts may rule only where an "actual controversy" is presented. They are prohibited from entering judgments or orders where it appears that a judgment or order "would not terminate the controversy or some part thereof, giving rise to the proceeding." (Ill. Rev. Stat. 1989, ch. 110, par. 2—701(a).) Accordingly, the Federal ripeness doctrine has been embraced by our supreme court. See *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 546, 370 N.E.2d 223, 226.

■ The supreme court has held that in the context of a challenge against unlawful administrative action, the purpose of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and to protect the agencies from judicial inter-

ference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. (68 Ill. 2d at 546, 370 N.E.2d at 226.) The key considerations which must be taken into account when deciding whether a challenge to an administrative agency's decision should be dismissed on grounds of ripeness are the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *A.E. Staley Manufacturing Co. v. Illinois Commerce Comm'n* (1988), 166 Ill. App. 3d 202, 206, 519 N.E.2d 1130, 1133.

The basic issue posed by this appeal is whether the Commerce Commission has the legal authority to permit utilities to recover their demand-side management costs through riders instead of requiring them to utilize formal rate-making proceedings. This is the type of legal issue that courts have occasionally dealt with without requiring a specific attempt at enforcement. Under the test we have cited above, however, ripeness depends not only on how adequately a court can deal with the legal issue presented but also on the degree and nature of the administrative decision's present effect on those seeking relief. *Toilet Goods Association v. Gardner* (1967), 387 U.S. 158, 164, 18 L. Ed. 2d 697, 702, 87 S. Ct. 1520, 1524.

■ In this case, the Commerce Commission's pronouncements on the propriety of riders will have no immediate, tangible effects on UE, its shareholders, or its customers. Those pronouncements, after all, were made in the context of a proceeding whose purpose was to determine the adequacy of the energy plan submitted by UE under section 8—402 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402). This was not a proceeding in which UE was seeking authorization to implement a rider, and no rider was approved. Indeed, a specific rider mechanism has not yet even been proposed.

If and when UE is able to formulate a specific rider mechanism, it may not unilaterally implement that mechanism to recover its demand-side management costs from the members of the IIEC and its other customers. Rather, by the express terms of the Commerce Commission's order, UE must file its rider with the Commission in a separate proceeding, and implementation of the rider will be contingent upon review and approval by the Commission. There is no dispute that any such approval will, in turn, be subject to review by the courts. Those proceedings, in our view, will furnish the more appropriate forum for challenging the legality of the use of a rider mechanism for the purposes suggested by UE. Until those proceedings take place, until UE's customers are directly faced with having a specific rider actually implemented, consideration of the propriety of such

riders is merely "an abstract disagreement over an administrative policy," the resolution of which will not affect the challenging parties in a "concrete way." Under the authorities cited above, the issue is therefore not yet ripe for our consideration. Accordingly, the appeal by IIEC is hereby dismissed.

Appeal dismissed.

GOLDENHERSH, P.J., and WELCH, J., concur.