(Nos. 96250, 96294 cons.—

PHL, INC., *et al.*, Appellees, v. PULLMAN BANK AND TRUST COMPANY *et al.* (Judy Baar Topinka, Treasurer, Appellant).—PHL, INC., *et al.*, Appellees, v. PULLMAN BANK AND TRUST COMPANY *et al.* (Pullman Bank and Trust Company, Appellant).

*Opinion filed June 3, 2005.—Rehearing denied September 26, 2005.*

GARMAN and KARMEIER, JJ., took no part.
FREEMAN, J., dissenting.

Lisa Madigan, Attorney General, of Springfield (Gary S. Feinerman, Solicitor General, and Deborah L. Ahlstrand, Assistant Attorney General, of Chicago, of counsel), for appellant Judy Baar Topinka.

Andrew B. David and Pamela S. DiCarlantonio, of Sugar, Friedberg & Felsenthal, of Chicago, for appellant Pullman Bank & Trust Company.

William J. Harte and Joseph E. Tighe, of Chicago, for appellees.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

Section 8(b) of the Court of Claims Act provides that the Court of Claims shall have exclusive jurisdiction over "[a]ll claims against the State founded upon any contract entered into with the State of Illinois." 705 ILCS 505/ 8(b) (West 2000). At issue in this case is whether plaintiffs' claim for breach of contract, which was brought against the Treasurer of the State of Illinois, constitutes an action "against the State" so as to come within this provision. The appellate court concluded that it did not. No. 5—00—0206 (unpublished order under Supreme Court Rule 23). For the reasons that follow, we reverse.

## BACKGROUND

In 1982, the State of Illinois established the Illinois Insured Mortgage Pilot Program (Mortgage Program) in an effort to stimulate economic development within the state. Although the workings of the Mortgage Program

are somewhat complicated, it may be said, in general, that the program was implemented through the creation of a trust, funded with state money, from which loans were made to various commercial enterprises that had difficulty obtaining conventional financing.[1]

The details of the Mortgage Program, including the terms governing the creation of the trust and the manner in which loans were to be made by the trustee, were embodied in a purchase agreement, a trust indenture and a servicing agreement (collectively, the Trust Agreement). The Trust Agreement was executed on July 14, 1982, by the State of Illinois, acting through Treasurer Jerome Cosentino, with the concurrence of Governor James Thompson, and American National Bank and Trust Company of Chicago, both individually and as trustee. Under the terms of the Trust Agreement, the state is the sole owner of the trust estate and, through the Treasurer, directs the trust's activities.

In November 1982, in connection with the Mortgage Program, a first mortgage loan in the amount of $13.4 million was made to an Illinois limited partnership known as the Collinsville Hotel Venture. The funds from the loan were used by the partnership to finance a hotel in Collinsville, Illinois, which is now known as the Collinsville Holiday Inn. In December 1983, a first mortgage loan was made to another limited partnership, known as the President Lincoln Hotel Venture, in the amount of $15.5 million. The funds from this loan were used to finance the construction of a hotel in Springfield, Illinois, which is now known as the Springfield Renaissance Hotel.

---

[1]The original investment of state funds for the Mortgage Program trust was made under section 22$^{1}/_{2}$ of the Deposit of State Moneys Act (Ill. Rev. Stat. 1983, ch. 130, par. 41a), a general provision which, at that time, authorized the state Treasurer, with the approval of the Governor, to invest state funds in programs such as the Mortgage Program trust.

Throughout the 1980s, both hotel ventures had difficulties meeting their obligations under the Mortgage Program loans. As a result, both loans were restructured on at least two occasions. In 1992, a dispute arose between the hotel ventures and then-Treasurer Patrick Quinn regarding a term of the restructured loan agreements which required each hotel venture to provide the Mortgage Program trustee with a yearly "reliance letter." The trustee and Treasurer threatened to declare the loans in default because they believed that the reliance letters they had received were inadequate. In response, the hotel ventures filed suit against the Treasurer and trustee to enjoin the declaration of default.

The circuit court of Cook County dismissed the hotel ventures' action based on the doctrine of sovereign immunity. In October 1994, the appellate court affirmed. See *President Lincoln Hotel Venture v. Bank One*, 271 Ill. App. 3d 1048 (1994). The hotel ventures' request for rehearing in the appellate court was denied on May 5, 1995. Thereafter, the hotel ventures filed a petition for leave to appeal in this court, which remained pending until October 1995.

In November 1994, defendant Judy Baar Topinka was elected Treasurer of the State of Illinois. After assuming office, Treasurer Topinka installed defendant Pullman Bank and Trust Company (Pullman Bank) as trustee of the Mortgage Program trust.

Beginning in December 1994, and continuing through the first part of 1995, the hotel ventures engaged in discussions with Treasurer Topinka about the possibility of purchasing the hotel venture loans from the state. The terms of sale which were discussed included the settlement of the reliance letter litigation, which was still ongoing at that time. As a result of these discussions, the plaintiffs in this case, which are two entities described in the record as having a "business relationship" with the

hotel ventures, agreed to purchase the hotel venture loans. Plaintiff PHL, Inc., agreed to buy the first mortgage loan relating to the Collinsville Holiday Inn for $6.3 million, while plaintiff The President Lincoln Hotel Corporation agreed to pay $3.7 million to acquire the first mortgage loan relating to the Springfield Renaissance Hotel.

On April 19, 1995, plaintiffs entered into separate buy-sell agreements with Pullman Bank, as trustee of the Mortgage Program trust, to purchase the hotel venture loans. The agreements were identical, except for the name of the buyer and the purchase price. Joinders to the agreements were signed by the hotel ventures and Treasurer Topinka. Both buy-sell agreements expressly stated that they were being entered into, in part, to settle the reliance letter litigation and both agreements contained provisions in which the state agreed not to pursue any claims against the hotel ventures in relation to the loans. Closing on the buy-sell agreements was set for June 1995.

After the Treasurer and trustee signed the buy-sell agreements, Attorney General Jim Ryan publicly stated that he would review the terms of the agreements. In July 1995, the Attorney General announced that he would not approve the buy-sell agreements.

The Attorney General's decision to withhold approval of the agreements rested on two grounds, the first of which was financial. In a report prepared by a group of University of Illinois professors, the combined value of the two hotel venture loans was estimated at approximately $18 million to $19 million. Thus, because the state was to receive a total of only $10 million under the buy-sell agreements, the Attorney General concluded that the consideration the state was to receive for the hotel venture loans and the settlement of the reliance letter litigation was inadequate.

The second reason the Attorney General gave for withholding approval of the buy-sell agreements was found in an opinion letter issued by the Attorney General on July 10, 1995. See 1995 Ill. Att'y Gen. Op. No. 95—003. In this opinion, the Attorney General observed that the Trust Agreement, as it then existed, did not authorize the Mortgage Program trustee to settle mortgage loans for an amount less than their full value. The buy-sell agreements, however, did so. Therefore, the Attorney General concluded, unless the Trust Agreement was amended, at the direction of the state, the trustee would have no authority to surrender or execute the documents necessary to close on the buy-sell agreements.

The Attorney General's opinion further observed that the Trust Agreement did not specify who may execute the consent to amend the Trust Agreement on behalf of the state, nor the form the consent should take. The Attorney General noted, however, that the Governor's involvement was "indispensable to the creation and ongoing operation" (1995 Ill. Att'y Gen. Op. No. 95—003, at 7) of the Mortgage Program and, further, "that in 1992, when a similar outstanding loan was settled, the Governor's signature was affixed to the direction authorizing the Trustee to execute the instruments necessary to accept the settlement." 1995 Ill. Att'y Gen. Op. No. 95—003, at 7-8. Moreover, according to the Attorney General, the Trust Agreement itself provides "that the parties to the Agreement include the Trustee and the State of Illinois, which is described as 'acting by and through its Treasurer ***, with the consent of its Governor ***.' " 1995 Ill. Att'y Gen. Op. No. 95—003, at 8. From this, the Attorney General concluded that

"it was clearly contemplated by the parties that the representatives of the State, for purposes of acting under the Trust Agreement, are the Treasurer and the Governor, and that the concurrence of both the Governor and the Treasurer is necessary to validate actions taken on behalf

of the State thereunder. Consequently, it is my opinion that both the Governor and the Treasurer must authorize the amendment of the Trust Agreement and give their consent to the proposed transaction in order to effectuate it." 1995 Ill. Att'y Gen. Op. No. 95—003, at 9. Because the Governor had not authorized any amendment of the Trust Agreement or consented to the buy-sell agreements, the Attorney General concluded that the agreements were invalid.

After the Attorney General made his views on the buy-sell agreements known, Treasurer Topinka publicly indicated that she disagreed with the Attorney General's financial assessment of the agreements. The Treasurer stated that, in her view, the buy-sell agreements represented the best financial deal that could be made by the state with respect to the hotel venture loans. Nevertheless, based on the legal opinion of the Attorney General, and because the Governor had not consented to the buy-sell agreements, the Treasurer declined to close on the agreements.

In October 1995, the hotel ventures, the Treasurer, Pullman Bank as the Mortgage Program trustee, and the Attorney General executed an agreement settling the reliance letter litigation. Plaintiffs in the case at bar were not parties to this settlement, which did not reference the buy-sell agreement or any sale of the hotel venture loans. The same day that the settlement agreement was reached, the hotel ventures withdrew their petition for leave to appeal in the reliance letter litigation which was pending before this court. See *President Lincoln Hotel Venture v. Pullman Bank & Trust Co.*, 163 Ill. 2d 586 (1995) (petition for leave to appeal withdrawn).

Approximately two months after the settlement of the reliance letter litigation, on December 29, 1995, plaintiffs filed the present action in the circuit court of Madison County against the Treasurer and Pullman Bank. In their complaint, plaintiffs alleged that the

Treasurer possessed the "unqualified constitutional authority" to approve the sale of the hotel venture loans without the concurrence of the Governor. Plaintiffs further alleged that, by adhering to the Attorney General's legal opinion and failing to close on the buy-sell agreements, the Treasurer was "acting in derogation of her constitutional duties and in abuse of her discretion and authority." Plaintiffs requested the circuit court to "[o]rder the Treasurer to perform her constitutional duties" and to enforce the provisions of the buy-sell agreements calling for the state to sell the hotel venture loans.

The litigation which followed the filing of plaintiffs' suit was lengthy and involved. It is recounted here only as necessary to address the issues presented in this appeal.

After plaintiffs filed their complaint, both the Treasurer and Pullman Bank filed motions to dismiss, in which they argued that plaintiffs' cause of action was barred by sovereign immunity. Defendants maintained that, although plaintiffs' suit for breach of contract was brought against the Treasurer in her individual capacity, the state was in fact the real party in interest because a judgment in favor of plaintiffs would require the state to divest itself of the hotel ventures loans. In addition, because Pullman Bank was merely the agent of the state and could only act at the direction of the Treasurer with respect to the trust estate, defendants maintained that any action against Pullman Bank was also against the state. Defendants further noted that, under section 8(b) of the Court of Claims Act (705 ILCS 505/8(b) (West 2000)), the Court of Claims has exclusive jurisdiction over claims brought against the state for breach of contract. Thus, defendants argued that the circuit court lacked jurisdiction to hear plaintiffs' complaint and that the suit properly belonged in the Court of Claims. The circuit court denied defendants' motions to dismiss.

Thereafter, the Treasurer filed a motion for summary judgment in which she argued that the buy-sell agreements were unenforceable as a matter of law both because the Governor had not consented to them and because they lacked the Attorney General's approval. This latter argument was based on the fact that the buy-sell agreements were not simply contracts, but also settlement agreements which conclusively resolved the then-pending reliance letter litigation. Citing to *Gust K. Newberg, Inc. v. Illinois State Toll Highway Authority*, 98 Ill. 2d 58 (1983), the Treasurer maintained that it is the prerogative of the Attorney General to settle pending litigation in which the state is involved. Thus, according to the Treasurer, because the Attorney General had not consented to the settlement portions of the buy-sell agreements, the settlement was invalid. And, the Treasurer argued, because the settlement of the reliance litigation was a material covenant to the buy-sell agreements, the agreements themselves never became valid contracts and were therefore unenforceable. Pullman Bank also filed a motion for summary judgment which raised similar arguments.

In response to defendants' motions, plaintiffs filed a cross-motion for summary judgment, in which they argued that the Treasurer had the exclusive authority to close on the buy-sell agreements and that the Attorney General's approval of the buy-sell agreements was unnecessary. Plaintiffs did not dispute defendants' contention that, in general, it is the prerogative of the Attorney General to settle state litigation. However, plaintiffs argued that, in this case, the settlement of the reliance letter litigation in October 1995, although separate from the buy-sell agreements, nevertheless rendered the settlement portions of the buy-sell agreements irrelevant. Accordingly, because the settlement portions of the buy-sell agreements were no longer at issue, plaintiffs maintained

that the Attorney General's approval was not needed and that the court could order specific performance of the buy-sell agreements.

After hearing argument, the circuit court denied defendants' motions for summary judgment and granted plaintiffs' cross-motion. In so ruling, the circuit court held that consent of neither the Governor nor the Attorney General was necessary to render the buy-sell agreements enforceable. In a subsequent order, the court held that plaintiffs had been ready, willing and able to fulfill their obligations under the buy-sell agreements in June 1995. Finally, on March 13, 2000, the circuit court entered judgment in favor of plaintiffs. The court ordered the Treasurer and Pullman Bank, as trustee of the Mortgage Program trust, to specifically perform the buy-sell agreements. Defendants appealed.

In a divided opinion, the appellate court affirmed. No. 5—00—0206 (unpublished order under Supreme Court Rule 23). The appellate court rejected defendants' contention that plaintiff's suit was barred by sovereign immunity. In so holding, the appellate court observed that an exception to the doctrine of sovereign immunity applies when the state officer who is the subject of the complaint acts in excess of his or her authority. The appellate court reasoned that this exception was applicable in the case at bar because the Treasurer had "back[ed] out of an obligation based on an opinion of the Attorney General" and, in so doing, had improperly "relegat[ed]" her constitutional authority as Treasurer to the Attorney General.

Both defendants filed separate petitions for leave to appeal in this court. The petitions were allowed and defendants' appeals were consolidated.

## ANALYSIS

The Illinois Constitution of 1970 abolished the doctrine of sovereign immunity "[e]xcept as the General

Assembly may provide by law." Ill. Const. 1970, art. XIII, § 4. Pursuant to its constitutional authority, the General Assembly reestablished sovereign immunity in the State Lawsuit Immunity Act. 745 ILCS 5/0.01 *et seq.* (West 1998); *City of Springfield v. Allphin*, 74 Ill. 2d 117, 123 (1978). Section 1 of that enactment states that "[e]xcept as provided in [an act] to create the Court of Claims *** the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 1998). The Court of Claims Act, in turn, provides that the Court of Claims shall have exclusive jurisdiction over "[a]ll claims against the State founded upon any contract entered into with the State of Illinois." 705 ILCS 505/8(b) (West 2000).

As they did in the courts below, defendants maintain that plaintiffs' complaint is barred from the circuit court by section 8(b) of the Court of Claims Act. Defendants contend that plaintiffs' complaint is one for breach of contract; that Pullman Bank may act only at the direction of the Treasurer and, therefore, the Treasurer's actions are the relevant focus of inquiry in this case; that the complaint against the Treasurer is, in fact, against the state because a judgment in plaintiffs' favor would "operate to control the actions of the State" (emphasis omitted) (*Currie v. Lao*, 148 Ill. 2d 151, 158 (1992)) by forcing the state to sell the hotel venture loans; and, therefore, that plaintiffs' complaint must be heard in the Court of Claims.

Plaintiffs, in response, do not dispute that their complaint alleges a breach of contract, that the Treasurer's actions should be the focus of this appeal, or that an adjudication in their favor would cause the state to sell the hotel venture loans. Nevertheless, plaintiffs contend that section 8(b) is not controlling in the case at bar because an exception to the doctrine of sovereign immunity, often referred to as the "officer suit" exception, is applicable here.

In Illinois, the leading historical expression of the officer suit exception is found in *Schwing v. Miles*, 367 Ill. 436 (1937):

"where the action at law or suit in equity is maintained against a State officer or the director of a department on the ground that, while claiming to act for the State, he violates or invades the personal and property rights of the plaintiff under an unconstitutional act, or under an assumption of authority which he does not have, such suit is not against the State. (*Noorman v. Department of Public Works and Buildings, supra*; *Fitts v. McGhee*, 172 U.S. 516; *United States v. Lee*, 106 id. 196; *White Eagle Oil and Refining Co. v. Gunderson*, 205 N.W. (S. Dak.) 614; 43 A.L.R. 397.) The presumption obtains that the State, or a department thereof, will not, and does not, violate the constitution and laws of the State, but that such violation, if it occurs, is by a State officer or the head of a department of the State, and such officer or head may be restrained by proper action instituted by a citizen." *Schwing*, 367 Ill. at 441-42.

Stated otherwise, it is said that when an action of a state officer is undertaken without legal authority, such an action "strips a State officer of his official status *** [and] his conduct is not then regarded as the conduct of the State, nor is the action against him considered an action against the State." *Moline Tool Co. v. Department of Revenue*, 410 Ill. 35, 37 (1951).

The officer suit exception has a long and complex history, with its origination in the federal courts. See *Schwing*, 367 Ill. at 441, citing *Fitts v. McGhee*, 172 U.S. 516, 43 L. Ed. 535, 19 S. Ct. 269 (1899); *United States v. Lee*, 106 U.S. 196, 27 L. Ed. 171, 1 S. Ct. 240 (1882); see also *Ex Parte Young*, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908). In Illinois, the officer suit exception has been described as a means of protecting the rights of plaintiffs:

"[W]here the defendant officer act[s] in excess of his statutory authority, the rights of the plaintiffs to be free from the consequences of his action outweigh the interest of the

State which is served by the sovereign immunity doctrine." *Senn Park Nursing Center v. Miller*, 104 Ill. 2d 169, 188 (1984).

See also *Moline Tool Co.*, 410 Ill. at 37 (not all suits against state officers are barred because "[s]uch a holding would have blunted the effectiveness of many constitutional guaranties by preventing their judicial enforcement").

In *Smith v. Jones*, 113 Ill. 2d 126 (1986), this court held that the officer suit exception may be raised, as a general matter, in breach of contract cases which would otherwise fall under section 8(b) of the Court of Claims Act. *Smith*, 113 Ill. 2d at 131-32. However, this court also held that the exception does not apply when the action which the plaintiff alleges was taken in excess of authority is simply a breach of contract and nothing more. *Smith*, 113 Ill. 2d at 132-33 ("The plaintiffs['] complaint, thus, alleges only that the Director exceeded his authority by breaching a contract. Such an allegation does not deprive the defendants of the protection of the bar of sovereign immunity"). In the case at bar, defendants cite to *Smith* and contend that plaintiffs' cause of action is merely a breach of contract case and, therefore, that the officer suit exception is inapplicable.

Plaintiffs, however, maintain that the present case is unlike *Smith*. According to plaintiffs, in this case, the Treasurer did not simply breach a contract, she also acted in excess of her legal authority, specifically, the authority given her under article V, section 18, of the Illinois Constitution of 1970. That provision states:

"The Treasurer, in accordance with law, shall be responsible for the safekeeping and investment of monies and securities deposited with him, and for their disbursement upon order of the Comptroller." Ill. Const. 1970, art. V, § 18.

Plaintiffs allege in their complaint that the Treasurer acted "in derogation of her constitutional duties" under

article V, section 18, by "adhering to the Attorney General's financial analysis and legal opinion." Thus, plaintiffs contend, the officer suit exception applies and their complaint properly belongs in the circuit court.

Initially, we note that the Treasurer did not, in fact, adhere to the Attorney General's financial analysis of the buy-sell agreements. Indeed, there has never been any question in this case that, after the Attorney General announced the findings from the report prepared by the University of Illinois professors, the Treasurer publicly stated that, in her view, the buy-sell agreements were the best financial deal that could be made for the state with respect to the hotel venture loans. The circuit court, in its order on the parties' cross-motions for summary judgment, stated as an "undisputed fact" that "[t]he parties never closed on the Buy-Sell Agreements or the related Settlement Agreements because, on advice of the Attorney General, the Treasurer refused to do so." On appeal, the appellate court agreed, stating that "[a]fter entering into the Agreements, the Treasurer declined to act, based upon the advice contained in an opinion letter." No. 5—00—0206 (unpublished order under Supreme Court Rule 23). The lower courts' statements of the facts are not contested by the parties on appeal. Thus, with respect to whether the Treasurer acted "in derogation of her constitutional duties," the question we must decide is whether the Treasurer's decision to "adher[e] to the Attorney General's *** legal opinion" violated article V, section 18, of the Illinois Constitution. The answer to this question is no.

Article V, section 18, is a general grant of authority. Nothing in that provision forbids the Treasurer from receiving or following the advice of the Attorney General on a legal matter relating to the proper interpretation of trust documents. Accordingly, the fact that the Treasurer, in this case, chose to adopt the Attorney General's legal

opinion interpreting the Trust Agreement as her own does not mean that she acted outside the authority given to her under the constitution.[2]

Plaintiffs nevertheless express concern that a holding in this case that the Treasurer did not violate the constitution would mean that the Attorney General would have "veto authority over the Treasurer's right to enter into contracts to sell state investments." We disagree. As noted, in July 1995, the Attorney General issued an opinion letter in which he reasoned that the buy-sell agreements were invalid because, in order for those agreements to take effect, an amendment to the Trust Agreement was required and such an amendment could not be made, under the terms of the Trust Agreement itself, without the consent of the Governor. From the Treasurer's perspective, the Attorney General's opinion was persuasive authority but it was not legally binding. See *President Lincoln Hotel Venture*, 271 Ill. App. 3d at 1056; *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 399 (1994). The opinion did not, in a legal sense, stop or block the Treasurer from taking

---

[2]The dissent states that the Treasurer disagreed with the Attorney General's opinion letter and that she "publicly characterized the opinion as 'illogical' and 'unrealistic.' " 216 Ill. 2d at 277 (Freeman, J., dissenting). Although the dissent does not indicate the source of the Treasurer's statements, it appears that the dissent has taken them from an allegation found in plaintiffs' complaint and that the allegation has been misquoted. In paragraph 40 of their complaint, plaintiffs alleged that "on July 11, 1995, the Treasurer issued a press release stating that the *University of Illinois report* was 'illogical' and 'unrealistic.' " (Emphasis added.) Paragraph 40 alleges that the Treasurer disagreed with the financial assessment offered by the University of Illinois professors, not that the Treasurer disagreed with the Attorney General's opinion letter. In addition, the press release described in plaintiffs' complaint was not mentioned in any of the circuit court's subsequent rulings and we have been unable to locate it in the record.

any action she wished with respect to the buy-sell agreements. The Treasurer, of her own volition, decided to follow the legal advice of the Attorney General and forgo closing on the buy-sell agreements. Nothing in our decision in this case forces the Treasurer to adopt the advice of the Attorney General or gives the Attorney General the authority to unilaterally invalidate contracts entered into by the Treasurer. Our holding is simply that when, as in this case, the Treasurer chooses to follow the legal advice of the Attorney General regarding the proper interpretation of trust documents, the Treasurer does not violate article V, section 18.[3]

In addition, we note that were we to hold that the officer suit exception applies in this case, it would follow that every time the Treasurer decided to adopt any legal advice she would risk violating the constitution. Indeed, counsel for plaintiffs essentially conceded this point during oral argument before this court. Explaining why plaintiffs believe the Treasurer acted improperly in this

---

[3]The dissent states that the Treasurer's decision to forgo closing on the buy-sell agreements was not "voluntary" (216 Ill. 2d at 277 (Freeman, J., dissenting)) and repeatedly asserts that the Attorney General "would not *allow*" the Treasurer to proceed with the buy-sell agreements (emphasis in original) (216 Ill. 2d at 275-79 (Freeman, J., dissenting)). Notably, however, the dissent never identifies the means by which the Attorney General prevented the Treasurer from closing on the agreements. The closest the dissent comes to doing so is the dissent's statement that the "Attorney General placed the Treasurer in a situation where she was forced to choose between doing her job, *i.e.*, exercising her judgment on financial matters with respect to the Trust, or following the unsought advice of a fellow state officer." 216 Ill. 2d at 276 (Freeman, J., dissenting). In other words, according to the dissent, the Treasurer's actions were not "voluntary" because she had to decide whether or not to follow the Attorney General's legal opinion. This reasoning is unpersuasive. If the Treasurer chose to follow the Attorney General's legal opinion, then, by definition, her actions were voluntary.

case, counsel stated that "the Treasurer had a responsibility not to allow the Attorney General to dissuade her from her contract." But this assertion is unreasonable. The Treasurer should not be placed in the position of having to refuse to hear legal advice in order to avoid violating the constitution. Important decisions affecting the finances of this state should not have to be made in a legal vacuum.

The appellate court below, in discussing whether the Treasurer had exceeded her constitutional authority, concluded that the Treasurer's argument that the buy-sell agreements were ineffective without the Governor's consent was incorrect, as was her contention that the Attorney General's approval was necessary because the buy-sell agreements settled the reliance letter litigation. Based on these conclusions, the appellate court determined that the Treasurer had exceeded her constitutional authority because, as the appellate court stated, she had no authority *not* to execute the buy-sell agreements. Again, we disagree.

It is well settled that a state officer's erroneous exercise of a broad grant of delegated authority does not constitute an *ultra vires* act. As the United States Supreme Court has stated:

"[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ulta vires* his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. *A claim of error in the exercise of that power is therefore not sufficient."* (Emphasis added.) *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90, 93 L. Ed. 1628, 1636, 69 S. Ct. 1457, 1461 (1949).

In the case at bar, we express no opinion on whether

the Governor's consent was, in fact, required to effectuate the buy-sell agreements or whether the Attorney General's approval of the agreements was needed because the agreements settled litigation in which the state was involved. We note, however, that even accepting the appellate court's holdings on these issues as correct, the most that can be said with respect to the Treasurer's actions is that (1) she misread the terms of the Trust Agreement as requiring the Governor's consent for an amendment to that agreement when such consent was not, in fact, required and (2) she incorrectly believed that the settlement provisions contained in the buy-sell agreements were material covenants to those agreements when, in fact, the provisions were rendered irrelevant by the settlement of the reliance letter litigation in October 1995. These are errors of contract and trust interpretation. They are not actions forbidden under article V, section 18, and, hence, they are not *ultra vires* acts.

The parties also contest whether plaintiffs' cause of action is one which seeks prospective relief within the meaning of this court's decision in *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540 (1977). As this court has noted, *Bio-Medical Laboratories* "stands for the proposition that if a plaintiff is not attempting to enforce a present claim against the State, but rather seeks to enjoin a State officer from taking future actions in excess of his delegated authority, then the immunity prohibition does not pertain." *Ellis v. Board of Governors of State Colleges & Universities*, 102 Ill. 2d 387, 395 (1984); see also *Edelman v. Jordan*, 415 U.S. 651, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974) (drawing a distinction between prospective and retrospective relief in the context of sovereign immunity). Plaintiffs contend that their cause of action is not a present claim because they seek only to compel the Treasurer to take future action, *i.e.*, to close on the buy-sell agreements. Defendants, however,

maintain that because plaintiffs' action is one for breach of contract, it necessarily seeks to enforce current or existing agreements. Thus, according to defendants, plaintiffs' cause of action cannot be viewed as simply seeking prospective relief.

The rule stated in *Bio-Medical Laboratories* is that sovereign immunity will not bar a cause of action in the circuit court where the plaintiff seeks to bar "a State officer from taking future actions *in excess of his delegated authority*." (Emphasis added.) *Ellis*, 102 Ill. 2d at 395. Because we have determined that, in this case, the Treasurer did not take any action in excess of her delegated, constitutional authority, we need not consider whether plaintiffs' cause of action is a present claim or one which seeks prospective relief.

Finally, the dissent states that it is troubled by this court's approach to the question of "whether the Court of Claims can provide the remedy of specific performance." 216 Ill. 2d at 282 (Freeman, J., dissenting). The dissent states that "[i]t would appear from the conclusion reached by this court that the implicit answer to that question is yes." 216 Ill. 2d at 282 (Freeman, J., dissenting). This statement is incorrect. Nowhere in this opinion has this court made any determination, either explicit or implicit, as to whether the remedy of specific performance is available in the Court of Claims. Our decision in this case is limited solely to the question of whether the circuit court had jurisdiction to consider plaintiffs' complaint and, specifically, whether the officer suit exception is applicable in this case. The parties have not briefed the issue of whether the remedy of specific performance is available in the Court of Claims, and it is not necessary to decide that issue in order to resolve this case.

## CONCLUSION

The officer suit exception to the doctrine of sovereign

immunity is inapplicable under the facts of this case. Thus, section 8(b) of the Court of Claims Act is controlling, and the circuit court lacked jurisdiction to hear plaintiffs' complaint. Accordingly, the judgments of the circuit and appellate courts are reversed. The cause is remanded to the circuit court with directions to dismiss plaintiffs' complaint.

*Nos. 96250, 96294—Appellate court judgment reversed;*
*circuit court judgment reversed;*
*cause remanded with directions.*

JUSTICES GARMAN and KARMEIER took no part in the consideration or decision of this case.

JUSTICE FREEMAN, dissenting:

The court reverses the judgments of the appellate and circuit courts in this case, which held that jurisdiction over this cause rested in the circuit court of Madison County. I am unable to join in the opinion, however, because I believe several of the more troubling aspects of this case have been overlooked in the court's haste to rule that jurisdiction lies not in the circuit court but in the Court of Claims. In my view, the court's conclusory analysis with respect to the issue of sovereign immunity is at odds with the spirit of the officer suit exception to the doctrine of sovereign immunity. I believe today's opinion will have a negative impact on the future willingness of private citizens to do business in Illinois with state officials and therefore respectfully dissent.

The sovereign immunity issue was first raised in the circuit court in a motion to dismiss filed by defendants. The trial judge denied the motion because he believed that the case involved an inseparable combination of contractual and constitutional issues, which were inappropriate issues for the Court of Claims to decide. The appellate court agreed, holding that, *inter alia*, "[s]overeign immunity cannot provide a defense where the court

must determine if a State agent acted in violation of statutory or constitutional law or in excess of authority." *PHL, Inc. v. Pullman Bank & Trust Co.*, No. 5—97—1064 (July 28, 1998) (unpublished order under Supreme Court Rule 23).

The genesis of this suit was the 1982 establishment of the Illinois Insured Mortgage Pilot Program (Mortgage Program), which, as the court correctly notes, was designed to stimulate economic development in depressed areas within central and downstate Illinois. State monies were used to create a trust, which would lend money to various commercial enterprises that had experienced difficulty obtaining conventional financing. The trust agreement at issue in this case was executed by the State of Illinois, with the Treasurer directing the trust's activities. Relevant here is the fact that the Treasurer was charged under this statutory program with the responsibility of overseeing the state's investment.

In November 1982 and December 1983, two loans were made pursuant to the Mortgage Program to different hotel ventures. Unfortunately during the years that ensued, these borrowers had difficulty in meeting their financial obligations under the Mortgage Program loans. The terms of the loans were eventually restructured, but new disputes subsequently arose over the terms of the restructuring. As a result of the disputes, in 1994, plaintiffs began discussions with Treasurer Judy Baar Topinka regarding the possibility of purchasing the loans from the state. These discussions led to the creation of the buy-sell agreements that are at the heart of this case. The Treasurer and the trustee signed the buy-sell agreement on April 19, 1995. At that time, the Treasurer held a news conference where she explained the agreement and the benefits it would inure to the state. According to the terms of the agreements, the closing date was to be on or before June 30, 1995.

Shortly thereafter, on May 3, 1995, the Illinois Attorney General announced that he would investigate the propriety of the Treasurer's selling of the loans to plaintiffs and that the proposed closing would not take place until his review was completed. During the tenure of the "investigation," plaintiffs were told of the actions of the Attorney General with respect to his intervention into the buy-sell agreements and of the fact that the Treasurer "was acquiescent in the Attorney General's assertion that *he would make the ultimate decision related to her right to proceed with the buy-sell agreements*." Affidavit of Kathleen Vyborny, Defendants' Appendix, at A—117. The final day for the closing, June 30, 1995, passed without action.

On July 11, 1995, the Attorney General announced that he would not "approve" the agreements based upon the financial advice of a team of University of Illinois professors. On that same date, he also sent an opinion to State Senator Penny Severns in which he took the position that the Treasurer does not have "the authority to create a program of this sort, which extends to matters far in excess of the Treasurer's statutory and constitutional duties." 1995 Ill. Att'y Gen. Op. No. 95—003, at 6. The Treasurer publicly disagreed with the Attorney General's financial assessment of the agreements because, in her view, the agreements represented the best financial deal that could be made by the state with respect to the initial hotel venture loans. According to the record, the proposed sale was 20% higher than any other offer received for the loans, 30% higher than the June 1994 appraised value of the loans, and 50% higher than the book value of those loans. As a result of the Attorney General's opinion, the deal was considered "dead." Letter of Chief of Staff of the Attorney General, dated July 11, 1995, Defendants' Appendix, at A—112. In a letter to plaintiffs' attorney, the Attorney General

spoke of the need to look to the future in light of the fact that the deal was dead and that "to that end, and to aid this office in an analysis of the current status of the agreement of or any future proposal, please consider this our request to you, on behalf of your clients, to allow us the opportunity to examine the books and expense records of both hotels." Letter of Chief of Staff of the Attorney General, dated July 11, 1995, Defendants' Appendix, at A—112. Soon thereafter, this lawsuit commenced.

Plaintiffs argue that the Treasurer acted in derogation of her constitutional duties in refusing to perform her agreement to divest the state's holdings with respect to the hotel ventures after entering into binding agreements to do so. Defendants respond that the doctrine of sovereign immunity deprives the circuit court of jurisdiction over this cause. They maintain that plaintiffs' cause of action is a simple breach of contract case and that, as such, it must be brought in the Court of Claims.

Whether an action is in fact one against the state and hence one that must be brought in the Court of Claims depends not on the formal identification of the parties, but rather on the issues involved and the relief sought. *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990). The prohibition " 'against making the State of Illinois a party to a suit cannot be evaded by making an action nominally one against the servants or agents of the State when the real claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested.' " *Healy*, 133 Ill. 2d at 308, quoting *Sass v. Kramer*, 72 Ill. 2d 485, 491 (1978). The doctrine of sovereign immunity "affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority, and in those instances an action may be brought in circuit court." *Healy*, 133 Ill. 2d at 308 (and cases cited therein).

The doctrine serves to "protect[ ] the State from interference in its performance of the functions of government and preserve[ ] its control over State coffers." *S.J. Groves & Sons Co. v. State*, 93 Ill. 2d 397, 401 (1982).

The court holds that the officer suit exception to the doctrine of sovereign immunity is inapplicable here. In doing so, the court notes that "the most that can be said with respect to the Treasurer's actions is that (1) she misread the terms of the Trust Agreement as requiring the Governor's consent for an amendment to that agreement when such consent was not, in fact, required and (2) she incorrectly believed that the settlement provisions contained in the buy-sell agreements were material covenants to those agreements, when, in fact, the provisions were rendered irrelevant by the settlement of the reliance letter litigation in October 1995." 216 Ill. 2d at 267. The court then concludes that these errors are "errors of contract and trust interpretation" and are not unconstitutional, *ultra vires* acts. I find this conclusion rather troubling under the facts of this case because this case concerns more than just mere questions of contract interpretation.

As an initial matter, my disagreement with my colleagues lies not in the recitation of facts, with which I agree, but rather in the interpretation of those facts. Similar to the lower courts, I am troubled by the way in which the Attorney General left the Treasurer with little choice but to follow his opinion even though the Treasurer did not agree with it. In this case, we have a very public disagreement between the Attorney General and the Treasurer as to what steps to take to protect the state's interest in the Trust Agreement. It is clear from the record that the Treasurer was represented by counsel when she entered into the agreements with plaintiffs. The record is also clear that the Treasurer *did not seek* the Attorney General's input into the matter. Had the

Treasurer wanted the Attorney General's opinion, it stands to reason that she would have sought it *prior* to signing the agreements in the first place. The record indicates clearly that the Attorney General, on his own initiative, only entered into the fray after news accounts started to be published about the impending transaction. Indeed, the Attorney General's public posturing in this case at the time in question smacks more of sound-bite politics than of true legal or even financial acumen. As I shall explain, our state constitution does not give the Attorney General authority over the Treasurer in the manner that was exercised in this case. Nor does the Trust Agreement give the Attorney General the duties of oversight that the Attorney General willed unto himself. I believe that these concerns are what caused the lower courts that have addressed this issue to rule that sovereign immunity does not lie under these facts. The record makes clear that once the Attorney General entered into the matter, the Treasurer, for all intents and purposes "opted out," despite her conviction that the deal she brokered was in the best financial interests of the state. The record establishes that the Treasurer did not act in June because she was going to let the Attorney General make the ultimate decision on her right to close. It is clear from reviewing the contemporaneous statements regarding the transaction that are contained in the record that the Treasurer was ready and willing to execute the buy-sell agreements, which she believed to be in the best financial interests of the state, until the Attorney General intervened. As noted previously, plaintiffs were informed in early May 1995, that the *ultimate decision* regarding the sale would be made by the Attorney General. And it is here where I part company with my colleagues because I do not believe that it is proper to use the doctrine of sovereign immunity under these circumstances. The Treasurer

violated her constitutional obligation by allowing the Attorney General to make the *ultimate decision* regarding whether the sale would be made.

As I noted, the Trust Agreement does not charge the Attorney General with any oversight responsibilities. The Trust Agreement names the Treasurer as the constitutional officer charged with such duties. The record affirmatively demonstrates that, despite having this authority, it was the Attorney General who announced that he would not "approve" the agreements. Meanwhile, the Treasurer allowed the closing date to pass while she awaited the final word regarding its merits, both financial and legal, from the Attorney General. Thus, for all intents and purposes, it was the Attorney General who took charge of the oversight of the Trust Agreement. The Attorney General's review was not completed until July 10, 1995, and it was at that time that he publicly announced that the Treasurer did not have the authority to make the transaction and that her doing so was in excess of any of her statutory or constitutional duties. The Attorney General's July 11, 1995, letter to plaintiffs, in which he requested the books and expense records of both hotels, indicates to me, at least, that the Attorney General was taking over a greater role in the handling of the Trust Agreement.

In light of the above, the Attorney General killed the deal on the basis of his legal conclusion that the buy-sell agreements were invalid and his conclusion that the agreements were fiscally inadvisable for the state. These facts are recounted in the news accounts that were made a part of the record, which reveal that the Attorney General on the day that he announced that the deal was "dead" was quoted as saying, "After a careful, comprehensive review by both my staff and the U of I team, I conclude that it is not in the state's best interest *** to settle. It's a bad deal for the state." Defendants' Ap-

pendix, at A—123. The Attorney General also took the position that any loan arrangement made by the Treasurer would need *his* approval.[4] Contrariwise, at a separate news conference held on the same day, the Treasurer was quoted as saying that she told the Attorney General that she "could not accept the numbers" and insisted that the deal she struck was financially the most lucrative the state could hope for. Defendants' Appendix, at A—121. Clearly, the record establishes that the Attorney General would not *allow* the Treasurer to proceed with this transaction. Stated simply, the situation we have at bar has two constitutional officers at loggerheads over who has the authority to do what. The Attorney General placed the Treasurer in a situation where she was forced to choose between doing her job, *i.e.*, exercising her judgment on financial matters with respect to the Trust, or following the unsought advice of a fellow state officer. The court states that the Treasurer's actions must be construed as voluntary because the Attorney General's advice was not legally binding and that she was free to disregard it. I disagree because the tone and tenor of the contemporaneous comments suggest otherwise. The Attorney General repeatedly stated publicly that the deal would not go through without *his* approval. Indeed, letters contained in the record indicate that it was the Attorney General, not the Treasurer, who would examine "the books and expense records" with respect to any analysis of the agreement in question or any future proposal. It would seem that this type of

---

[4]It is important to note that nowhere in the statutory program which spawned the Trust Agreement is authority to approve loan arrangements given to the Attorney General. Nor does the statute provide the Attorney General with fiscal oversight with respect to the best interests of the state. Rather, under the statutory framework of the Mortgage Program, the Treasurer was charged with these responsibilities.

conflict would fall within the officer suit exception to the doctrine at least with respect to the circumstances here.

On the day that the Attorney General stated his opinion and announced that the deal was dead, the Treasurer publicly characterized the opinion as "illogical" and "unrealistic" and likened the Attorney General's actions to "reversing the outcome of the Super Bowl on the basis of armchair speculation from Monday morning quarterbacks." The Treasurer further stated that the agreements were valid, yet still inexplicably followed the Attorney General's opinion. The Treasurer's colorful sporting analogy reveals that the Treasurer did in fact delegate her duties to the Attorney General. The only way a Monday morning quarterback can control the outcome of the Super Bowl is if the officials whose job it is to rule on calls allow themselves to be reversed by others. The Treasurer, whose job it was to "make the call" in this case allowed herself to be reversed by an official who had no legal or constitutional right to "make the call." This demonstrates the type of constitutional derogation of duty that both the lower courts in this case were troubled by and why they ruled that the doctrine of sovereign immunity did not apply to this case. The court today chooses to characterize the Treasurer's actions as purely voluntary, but I do not. In my view, the Treasurer, at the time all of these events occurred, took a "my hands are tied" approach to the Attorney General's intervention. The plaintiffs allege that by taking such approach, the Treasurer delegated her constitutional duties in such a way as to render inapplicable the doctrine of sovereign immunity. I agree. The record indicates that the Treasurer believed the agreements were valid and the Attorney General was wrong on a financial level. The Treasurer was constitutionally and statutorily obligated to protect the state's assets and follow through on her contractual obligations.

In her brief, the Treasurer claims that her actions in failing to perform the contract cannot be equated with her violating any constitutional or statutory duty. I believe her argument, however, oversimplifies matters to an extent—the Treasurer failed to perform the contract because the Attorney General would not let her proceed and she did nothing to prevent him from doing so. This raises the troubling specter of our Attorneys General having the power to invalidate every contract entered into by state officials at his or her whim. It also suggests that the Attorney General has the power to "go over the head" of the Treasurer in matters related to the duties of her office. Such a holding would appear to be at odds with our case law in this area.

Under our current state constitution, the Treasurer "in accordance with law, shall be responsible for the safekeeping and investment of monies and securities deposited with him." Ill. Const. 1970, art. V, § 18. Although our Constitution does not provide a precise explanation of the Treasurer's duties, this court has noted that

"[i]n the absence of a constitutional definition of his powers and duties the primal functions of a treasurer are necessarily implied. He is required to perform the duty of receiving and safely keeping the public funds which are entrusted to him, even in the absence of a statute. The very name given to his office denotes his obligation in this regard and the constitution implies it. Both the power and the duty of receiving and safely keeping the public funds entrusted to him are within the purview of the powers and duties which are inherent in his office and in no way depend upon the authority of the General Assembly. He can neither be deprived of the power nor relieved of the duty." *People ex rel. Nelson v. West Englewood Trust & Savings Bank*, 353 Ill. 451, 465 (1933).

Moreover, the Treasurer, under the terms of the Trust Agreement, was made the state officer responsible for directing the trust activities, a trust which was funded with state monies.

Here, it is clear that the Treasurer believed that she had the authority to enter into the agreements and, until the time the Attorney General intervened, was prepared to close on the deal because she believed that it represented the best financial deal the state could get. These actions are consistent with her authority under the Trust Agreement and under her general duties as Treasurer. The Attorney General then stepped into the matter and asserted both his legal and financial opinions over it. I believe that once the Treasurer signed the agreements with plaintiffs, it was too late for the Attorney General to offer his opinion as to the validity of the agreements. Had the Attorney General had doubts about the legality of the Treasurer's actions, the better approach would have been for him to have initiated, as the state's chief legal officer, some type of injunctive action to preclude the sale in which a *judicial determination* regarding how many of this state's constitutional officers were needed to authorize these agreements could be made. In fact, the Attorney General's office's "Guidelines" suggest that this is the proper course of action to take in such instances. See appendix ("Statement of Policy of the Attorney General Relating to Furnishing Written Opinions, Adopted March 29, 1962").[5] The legal questions regarding the authority to enter into the agreements are, at the end of the day, questions that can only be resolved with

---

[5]The Guidelines give four examples of situations in which no opinion will be issued. At least three of the four situations indicated in the guidelines are arguably at play in this case, including (i) opinions will not be furnished regarding the exercise of executive judgment, (ii) opinions should not be requested unless a *bona fide* need exists by the party requesting it with respect to the performance of his or her official duties, and (iii) opinions should not be furnished in cases of difficult or important questions of law and resort should be made to a declaratory judgment action. See appendix ("Statement of Policy of the Attorney General Relating to Furnishing Written Opinions, Adopted March 29, 1962").

definitiveness by the judicial branch. Attorney General opinions are advisory in nature and are not binding upon the state or the courts. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391 (1994); W. Scott, *The Role of Attorney General's Opinions in Illinois*, 67 N.W. L. Rev. 643 (1972). Thus, we do not know whether the Attorney General's opinion is correct—the analysis used in today's opinion is such that judiciary need never determine whether that opinion withstands scrutiny. See 216 Ill. 2d at 266-67 (expressing "no opinion" as the correctness of the Attorney General's opinion). Unfortunately, the court's treatment of this issue prevents our courts from addressing any of these important matters.

The primary case upon which the court relies, *Smith v. Jones*, 113 Ill. 2d 126 (1986), can be distinguished in that the plaintiffs there did not allege a violation of the law. Indeed, the complaint itself recognized that the state official's actions in question were done "pursuant to the *letter* of the [Lottery] Act and the rules and regulations thereunder." (Emphasis in original.) *Smith*, 113 Ill. 2d at 132. The court in *Smith* stressed that the allegations of the complaint were only that the official exceeded his authority by breaching the contract. In contrast, the allegations here are that the Treasurer abdicated her authority to the Attorney General. Plaintiffs argue that the contract was breached, not because the Treasurer was following the letter of the law, but was allowing, contrary to the constitution and her duty under the Mortgage Program, another state official to make calls that she alone had the authority and the discretion to make. Whereas what was involved in *Smith* was, in the court's words, "simply a drawing in which the amount of prize money due the plaintiffs is in dispute" (*Smith*, 113 Ill. 2d at 133), what is involved here is whether it is proper for a constitutional officer to pass her duties on to another constitutional officer.

As noted previously, one of the purposes of sovereign immunity is to preserve the state's coffers. Ironically, the court's decision to invoke the doctrine here does more to harm those coffers than to protect them. The record is replete with references to the financial cost to the state in maintaining the initial loans. The agreement reached by the Treasurer and the plaintiffs had many benefits— the first of which was that the state would no longer be liable for the hotel properties, which had the potential to end up in foreclosure. The state was also to receive more money than was previously offered by other potential buyers. The record contains no mention of the current financial status of the loans, and the parties have not apprised us of any change to that status. As a result, there is no reason for this court to ignore the record evidence in this case, namely, that the agreements reached by the Treasurer had many financial benefits for the state. Based on the facts as they are currently before us, it is my belief that the application of sovereign immunity to this case frustrates, rather than serves, the goal behind the doctrine.

In my view, the court's opinion simply concludes that any errors made by the Treasurer in this case constitute errors of contract law. I believe this approach fails to address the crux of plaintiffs' arguments. The question is not whether the Treasurer made a mistake in interpreting a contract or a trust agreement. Rather, the question is whether the Treasurer abdicated her duty by allowing her actions to be dictated by the Attorney General knowing that the financial interests of the state were better served by closing on the agreements. The court states that the Treasurer "should not be placed in the position of having to refuse to hear legal advice in order to avoid violating the constitution." 216 Ill. 2d at 266. I am not advocating putting the Treasurer in the position of "refusing to hear legal advice." The Treasurer in this

case did not have to "refuse to hear" the Attorney General's advice, but she did have an obligation to refuse to *follow* that advice when she believed that the advice was not in the best interests of the state. The record makes clear that the Treasurer publicly and openly disagreed with the Attorney General on every level—she believed that her agreements with plaintiffs were valid and that the deal was in the financial interests of the state. When such conflicts arise amongst constitutional officers, the solution is not for one to "back down" to the other as the court seemingly suggests today. I am concerned about this because I believe this case, at root, represents the ability of our citizens to trust and have faith in the actions of our public officials. They need to trust, for example, when dealing with a state treasurer in negotiations such as these, that another constitutional officer will not be able to "kill" the deal with such unfettered power. Today's opinion certainly does not allay fears that dealings with state officials are not fair and evenhanded.

I also find another aspect of the court's opinion troubling. The court notes that the proper tribunal for the adjudication of this claim is the Court of Claims. Plaintiffs here, however, are seeking specific performance. During oral argument, the parties were asked whether the Court of Claims can provide the remedy of specific performance. It would appear from the conclusion reached by this court that the implicit answer to that question is yes. The Court of Claims, however, has persistently recognized that it cannot grant equitable relief (see *Garimella v. Board of Trustees of the University of Illinois*, 50 Ill. Ct. Cl. 350 (1996) (and cases cited therein)) despite pronunciations by this court and our appellate court which would appear to take a contrary view. See *Ellis v. Board of Governors of State Colleges & Universities*, 102 Ill. 2d 387 (1984); *Management Ass'n of*

*Illinois, Inc. v. Board of Regents of Northern Illinois University*, 248 Ill. App. 3d 599 (1993); *Brucato v. Edgar*, 128 Ill. App. 3d 260 (1984). Given the differing opinions that exist on this issue and the fact that questions were raised at oral argument with respect to it, I would order additional briefing on the matter so that our opinion in this case would speak clearly on this important issue.

In light of the above, I am unable to join in my colleagues' opinion and respectfully dissent.

**APPENDIX**

**STATEMENT OF POLICY
OF THE ATTORNEY GENERAL RELATING
TO FURNISHING WRITTEN OPINIONS**
Adopted March 29, 1962

The Attorney General of the State of Illinois makes the following statement of policy relating to the constitutional and statutory duty to give written opinions.

A.   Persons to Whom Opinions Will Be Issued

1.   The Attorney General will furnish written opinions as required by law to the Governor and other elected and appointed State officers upon legal or constitutional questions relating to the duties of those officers, respectively.

2.   The Attorney General will furnish written opinions to the officers of either branch of the General Assembly and chairpersons and minority spokespersons of committees thereof on matters that relate to their duties as such.

3.   The Attorney General will consult with and advise the several State's Attorneys in matters relating to the duties of their offices and will furnish written opinions to State's Attorneys in matters relating to their official duties, when appropriate.

4.   The Attorney General is not authorized to furnish written opinions to the officers of, or attorneys for, public corporations, municipal corporations, townships or other political subdivisions of the State, in the absence of specific statutory authority providing therefor.

5.   The Attorney General is not authorized to furnish opinions to private persons or entities.

B.   Form in Which Opinion Requests Should Be Made

1.   Requests must be in the form of a letter and addressed to the Attorney General, attention Opinions Bureau, 500 South Second Street, Springfield, Illinois 62706.

2. All requests must contain a clear, concise question of law and a complete statement of the facts describing the situation out of which the legal issue arises. The Attorney General will not seek out the facts or infer the question from enclosed correspondence. All requests should name a person whom the staff of the Attorney General may contact to discuss the request.

3. Requests made by executive officers, by chairpersons, directors, heads or executive secretaries of boards, commissions, departments and agencies of the State, by officers of the General Assembly and its committees and commissions and by State's Attorneys must be *signed or endorsed by such* officers.

4. Requests from officers under the jurisdiction of the Governor must also be forwarded through his office, in accordance with his policy.

C. Situations in Which No Opinion Will Be Issued

1. The Attorney General will not furnish opinions regarding the exercise of executive judgment or discretion, nor on questions of fact.

2. The Attorney General will not furnish opinions on questions scheduled for determination by the courts.

3. No opinion should be requested unless a *bona fide* need exists by the party requesting it with respect to the performance of his or her official duties.

4. For a particularly difficult and important question of law, officials should resort to a declaratory judgment action whenever practicable, and the Attorney General may recommend this or other courses of action that may be more appropriate than the issuance of an opinion

D. Miscellaneous Provisions

1. Officers requesting opinions and interested private parties or other governmental agencies may submit memoranda of law and policy and other statements and material for the consideration by the Attorney General. Such material should be submitted to the attention of the Opinions Bureau in the Springfield office of the Attorney General.

2. All official opinions of the Attorney General are signed by the Attorney General. Informal opinions and other letters signed by Assistant Attorneys General are not official opinions

3. All opinions are on file in the Attorney General's office in Springfield.

■

4. These guidelines do not apply to the furnishing of interpretive opinions by the Attorney General as administrator of the Franchise Disclosure Act of 1987 (815 ILCS 705/1 *et seq.* ).

5. In order for the Attorney General to act in the best interests of the public and the State, all guidelines are subject to exception where special circumstances can be shown to warrant an exception

Please note that it is very helpful for the Attorney General to be apprised of all background information relating to an opinion request. Further, any information relating to the *practical effect* of any particular resolution of a question posed should be included with a request for an opinion.